ORAL ARGUMENT NOT YET SCHEDULED

Case Nos. 14-1012 and 14-1071 (consolidated)

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

EDISON ELECTRIC INSTITUTE, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

INITIAL BRIEF OF PETITIONER

Stephen M. Spina
John Daniel Skees
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000
sspina@morganlewis.com

Edward H. Comer
Vice President, General Counsel,
  and Corporate Secretary
Barbara A. Hindin
Associate General Counsel for
  Industry Structure
Henri D. Bartholomot
Associate General Counsel,
  Regulatory and Litigation
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 508-5000
ecomer@eei.org

*Counsel for Edison Electric Institute*

Initial Brief: July 22, 2014

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned certifies as follows:

## I.    PARTIES AND AMICI

The Petitioner in these consolidated proceedings is the Edison Electric Institute ("EEI").  The Respondent is the Federal Energy Regulatory Commission ("FERC").  The American Public Power Association, Avista Corporation, Modesto Irrigation District, the North American Electric Reliability Corporation, Peak Reliability, Inc., and the Western Electricity Coordinating Council have intervened in these proceedings.

The following listed parties and intervenors appeared in the proceedings below in FERC Docket No. EL13-52-000:

American Public Power Association

Arizona Electric Power Cooperative, Inc.

Avista Corporation

Balancing Authority of Northern California

Bonneville Power Administration

California Department of Water Resources State Water Project

California Independent System Operator Corporation

City of Moreno Valley, California

City of Roseville Valley, California

Idaho Power Company

Modesto Irrigation District

Nevada Power Company and Sierra Pacific Power Company

North American Electric Reliability Corporation

Northeast Power Coordinating Council, Inc.

NorthWestern Corporation

PacifiCorp

Portland General Electric Company

Public Power Council

Puget Sound Energy, Inc.

Salt River Project Agricultural Improvement and Power District

San Diego Gas & Electric Company

Six Cities (Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside, CA)

Southwest Transmission Cooperative, Inc.

Southwest Transmission Dependent Utility Group

Tacoma Power

Tri-State Generation and Transmission Association, Inc.

Tucson Electric Power Company

Utah Associated Municipal Power Systems

Western Area Power Administration

Western Electricity Coordinating Council

Western Interconnection Regional Advisory Body

Xcel Energy Inc.

The following listed parties and intervenors appeared in the proceedings below in FERC Docket Nos. RR13-10-001, RR13-10-002, RR13-12-001, and RR13-12-002:

Avista Corporation

California Department of Water Resources State Water Project

Crowell & Moring LLP

Modesto Irrigation District

North American Electric Reliability Corporation

Northeast Power Coordinating Council, Inc.

Puget Sound Energy, Inc.

Western Interconnection Regional Advisory Board

## II.    RULINGS UNDER REVIEW

EEI seeks review of the following Commission orders:

*Western Elec. Coordinating Council*, 143 FERC ¶ 61,239 (June 20, 2013),

*reh'g denied*, 145 FERC ¶ 61,202 (December 6, 2013); and *North Am. Elec.*

*Reliability Corp.*, 146 FERC ¶ 61,092 (February 12, 2014), *reh'g denied*, 147

FERC ¶ 61,064 (April 23, 2014).

## III.      RELATED CASES

The orders under review in this proceeding have not previously been before

this Court, or any court.

This appeal addresses two consolidated petitions for review.  EEI's petition

for review of FERC's decisions in *Western Elec. Coordinating Council*, 143 FERC

¶ 61,239 (June 20, 2013), *reh'g denied*, 145 FERC ¶ 61,202 (December 6, 2013),

was docketed by this Court in Case No. 14-1012.  EEI's petition for review of

FERC's decisions in *North Am. Elec. Reliability Corp.*, 146 FERC ¶ 61,092

(February 12, 2014), *reh'g denied*, 147 FERC ¶ 61,064 (April 23, 2014) was

docketed by this Court in Case No. 14-1071.  EEI filed an Unopposed Motion to

Consolidate Case No. 14-1012 with Case No. 14-1071 on June 3, 2014.  This

Court granted EEI's Motion on June 11, 2014.

Counsel is not aware of any other related proceedings before this Court or

any other court.

Respectfully submitted,

/s/ *Stephen M. Spina*

Stephen M. Spina
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

(202) 739-3000
sspina@morganlewis.com

*Counsel for Petitioner Edison Electric Institute*

Dated: July 22, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the Edison Electric Institute ("EEI") provides the following corporate disclosure statement as the petitioner in this case.

EEI is the trade association of U.S. shareholder-owned electric companies. EEI members serve 95% of the ultimate customers in the shareholder-owned segment of the industry, and they represent approximately 70 percent of the U.S. electric power industry.  EEI's members operate in all regions of the country and include load-serving entities in the Western Interconnection assessed charges authorized by the FERC orders under review.  EEI is a non-stock corporation with no parent companies, and no publicly-held company has an ownership interest in EEI.

Respectfully submitted,

/s/ *Stephen M. Spina*

Stephen M. Spina
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000
sspina@morganlewis.com

*Counsel for Petitioner Edison Electric Institute*

Dated: July 22, 2014

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

STATUTORY AND REGULATORY ADDENDUM TABLE OF CONTENTS . iii

TABLE OF AUTHORITIES ........................................................................ v

GLOSSARY OF ABBREVIATIONS ........................................................... x

JURISDICTIONAL STATEMENT ............................................................. 1

QUESTIONS PRESENTED ....................................................................... 3

STATUTORY AND REGULATORY ADDENDUM .................................... 4

STATEMENT OF FACTS AND OF THE CASE ........................................ 5

    I.    STATUTORY AND REGULATORY BACKGROUND ............................ 5

        A.    Federal Power Act Section 215............................................ 5

        B.    Section 215 Funding Regulations ....................................... 7

        C.    ERO Certification and Funding ......................................... 8

    II.  Funding for Reliability Coordination in the Western Interconnection .......... 9

    III. WECC Bifurcation and the Proceedings Below.......................................... 12

        A.    Declaratory Order Proceeding ........................................... 12

        B.    Compliance Filing Proceeding........................................... 16

SUMMARY OF ARGUMENT ................................................................... 19

STANDING ............................................................................................... 25

ARGUMENT ............................................................................................. 27

    I.    Standard of Review.............................................................................. 27

    II.  Section 215 Does Not Authorize FERC to Impose Mandatory Assessments to Fund Any Entity That Is Not the ERO or a Regional Entity.......................... 31

        A.    Peak Is Neither the ERO Nor a Regional Entity.................... 31

B.     Section 215 Limits Statutory Funding to the ERO and Regional Entities ..................................................................................32

C.     FERC's Regulations Limit Statutory Funding to the ERO and Regional Entities ..................................................................................33

D.     FERC's Precedent Limits Statutory Funding to the ERO and Regional Entities ..................................................................................35

III. Peak Is Not Performing Section 215 Functions and Therefore Cannot Receive Section 215 Funding ..............................................................37

A.     Section 215 Functions Do Not Include Reliability Coordinator and Interchange Authority Activities ..................................................38

B.     There Is No Regional Entity "Situational Awareness" Function, and If There Were, Peak Does Not Perform It.......................................46

C.     FERC's Orders Represent an Impermissible Interpretation of the Statute ..................................................................................51

IV. If The Reliability Coordinator and Interchange Authority Functions Are Statutory Peak Cannot Perform Them..............................................56

V.  NERC Lacks the Authority Necessary to Enable Sub-Delegation to Peak ..58

VI. FERC Has Departed from Precedent on the Controls for Statutory Delegations Without Explanation.......................................................61

CONCLUSION ........................................................................64

**STATUTORY AND REGULATORY ADDENDUM**
**TABLE OF CONTENTS**

## STATUTES

Administrative Procedure Act, Section 10(e), 5 U.S.C. § 706 .................... A1

Consolidated Appropriations Act, 2012, Pub. L. 112-74, 125 Stat. 786, 875

    (112th Cong. 1st Sess. Dec. 23, 2011) .............................. A2

Energy Policy Act of 2005, Pub. L. 109-58, Title XII, 119 Stat. 594

    Section 1211, Pub. L. 109-58, 119 Stat. 946 .................................... A3

Federal Power Act, 16 U.S.C. § 791, *et al.*

    Section 215, 16 U.S.C. § 824*o* .......................................... A9

    Section 313, 16 U.S.C. § 825*l* .......................................... A13

    Section 316A, 16 U.S.C. § 825*o*-1 .................................. A15

Omnibus Budget Reconciliation Act of 1986, 42 U.S.C. § 7178 .............. A16


## REGULATIONS

18 C.F.R. § 39.1 ..................................................................... A19

18 C.F.R. § 39.2 ..................................................................... A19

18 C.F.R. § 39.3 ..................................................................... A20

18 C.F.R. § 39.4 ..................................................................... A21

18 C.F.R. § 39.8 ..................................................................... A25

18 C.F.R. § 39.11 ................................................................... A26

18 C.F.R. § 40.1 ..................................................................... A27

18 C.F.R. § 40.2 ..................................................................... A27


## OTHER AUTHORITIES

NERC Reliability Standards

    INT-005-3, Interchange Authority Distributes Arranged Interchange

    ..................................................................... A29

    INT-007-1, Interchange Confirmation ........................................... A31

IRO-001-1.1, Reliability Coordination — Responsibilities and
Authorities ..................................................................... A34

IRO-002-2, Reliability Coordination — Facilities......................... A39
IRO-004-2, Reliability Coordination — Operations Planning........ A42
IRO-005-3.1a, Reliability Coordination — Current Day Operations ....
.................................................................................... A43

IRO-008-1, Reliability Coordinator Operational Analyses and Real-
time Assessments.......................................................... A48

IRO-009-1, Reliability Coordinator Actions to Operate Within IROLs
.................................................................................... A50

TOP-003-1, Planned Outage Coordination ..................................... A53

TOP-007-0, Reporting System Operating Limit (SOL) and
Interconnection Reliability Operating Limit (IROL) Violations .... A56

NERC Rules of Procedure

Appendix 5B (Statement of Compliance Registry Criteria) ........... A59

## TABLE OF AUTHORITIES

**CASES**

*Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009)................................. 9, 27, 51

*Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998) ..................33

*American Gas Association v. FERC*, 593 F.3d 14 (D.C. Cir. 2010) ......................30

*American Library Association v. FCC*, 406 F.3d 689 (D.C. Cir. 2005).................29

*Andrus v. Glover Construction Company*, 446 U.S. 608 (1980)...........................33

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988).........................61

*California Independent System Operator Corporation v. FERC*, 372 F.3d 395
    (D.C. Cir. 2004) ................................................................ 29, 33, 57, 58

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837
    (1984)...................................................................... 28, 33, 45, 51, 57

*City of Arlington, Texas v. FCC*, 133 S. Ct. 1863 (2013).........................................45

*City of Charlottesville, Virginia v. FERC*, 661 F.2d 945 (D.C. Cir. 1981)...... 61, 64

*Continental Casualty Company v. United States*, 314 U.S. 527 (1942).................33

*DTE Energy Co. v. FERC*, 394 F.3d 954 (D.C. Cir. 2005) ....................................27

*Electric Power Supply Association v. FERC*, Case No. 11-1486, slip op. (D.C.
    Cir. May 23, 2014) ........................................................ 29, 52, 53, 54

*Entergy Services, Inc. v. FERC*, 319 F.3d 536 (D.C. Cir. 2003)............................36

*Exxon Co. U.S.A. v. FERC*, 182 F.3d 30 (D.C. Cir. 1999).....................................61

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502  (2009) ..................................37

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)......................29

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)..................................61

*FPC v. New England Power Co.*, 415 U.S. 345 (1974) .........................................55

*Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006) .................................................52

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970).............62

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977)....25

*Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986).....................58

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................................26

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...........................................................50

*Michigan Public Power Agency v. FERC*, 405 F.3d 8 (D.C. Cir. 2005)................30

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001) .................................................58

*Midwest ISO Transmission Owner, et al. v. FERC*, 373 F.3d 1361 (D.C. Cir. 2004)
...........................................................................................................................49

*\*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
Insurance Company*, 463 U.S. 29 (1983)......................................... 30, 38, 49, 50

*National Cable & Telecommunications Association v. Brand X Internet Services*,
545 U.S. 967 (2005) ..................................................................... 38, 46

*National Cable Television Association v. United States*, 415 U.S. 336 (1974) ......55

*Natural Resources Defense Council, Inc. v. EPA*,
822 F.2d 104 (D.C. Cir. 1987) ........................................... 38, 49, 50, 51

*New York Regional Interconnect, Inc. v. FERC*, 634 F.3d 581 (D.C. Cir. 2011) ...25

*North American Electric Reliability Corp. v. Barrick Goldstrike Mines Inc.*, Case
No. 11-cv-00794 (D. Nev.)....................................................................8

*PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194 (D.C. Cir. 2005)..............30

*\*PSEG Energy Resources & Trade LLC v. FERC*,
665 F.3d 203 (D.C. Cir. 2011) .............................................. 30, 46, 58

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).............. 36, 50

*Southeastern Community College v. Davis*, 442 U.S. 397 (1979)................... 50, 54

*Southwest Power Pool, Inc. v. FERC*, Case No. 12-1158, slip op. (D.C. Cir. Dec. 3,
2013)...................................................................................................26

*Stinson v. United States*, 508 U.S. 36 (1993)................................................. 33, 35

*United States v. Morton*, 467 U.S. 822 (1984) ......................................................49

## STATUTES

*Administrative Procedure Act, Section 10(e),

5 U.S.C. § 706 ................................................... 28, 29, 30, 31, 32, 38, 45, 58, 61

Consolidated Appropriations Act, 2012, Pub. L. 112-74, 125 Stat. 786................55

Energy Policy Act of 2005, Pub. L. 109-58, Title XII, 119 Stat. 594 ..................5, 7

*Federal Power Act, Section 215,

16 U.S.C. § 824*o* ... 1, 5, 6, 7, 31, 32, 37, 38, 39, 41, 45, 48, 51, 53, 54, 56, 59, 61

Federal Power Act, Section 313, 16 U.S.C. § 825*l* ....................................... 1, 2, 25

Federal Power Act, Section 316A, 16 U.S.C. § 825*o*-1 ...........................................5

Omnibus Budget Reconciliation Act of 1986, 42 U.S.C. § 7178...........................55

## FERC ADMINISTRATIVE ORDERS

*North American Electric Reliability Corp.*, 116 FERC ¶ 61,062, *order on reh'g & compliance*, 117 FERC ¶ 61,126 (2006), *aff'd sub nom.*, *Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009) ......................................... 8, 9, 31, 32, 46, 50, 62

*North American Electric Reliability Corp.*,

117 FERC ¶ 61,091 (2006)...................................................... 9, 10, 11, 47, 48, 54

*North American Electric Reliability Corp.*,

119 FERC ¶ 61,059 (2007)................................................... 10, 11, 47, 48, 49, 50

*North American Electric Reliability Corp.*, 119 FERC ¶ 61,060 (2007) ......... 46, 62

*North American Electric Reliability Corp.*, 121 FERC ¶ 61,057 (2007) ......... 12, 53

*North American Electric Reliability Corp.*, 122 FERC ¶ 61,245 (2008) ..................8

*North American Electric Reliability Corp.*, 129 FERC ¶ 61,040 (2009) ...............35

*North American Electric Reliability Corp.*, 137 FERC ¶ 61,071 (2011) ...............35

*North American Electric Reliability Corp.*, 141 FERC ¶ 61,086 (2012) ......... 55, 60

*North American Electric Reliability Corp.*, 143 FERC ¶ 61,052 (2013) ...............60

*North American Electric Reliability Corp.*,

    146 FERC ¶ 61,092 (2014)...................................... 1, 2, 17, 18, 27, 40, 57, 59, 60

*North American Electric Reliability Corp.*,

    147 FERC ¶ 61,064 (2014)............................................................ 1, 2, 18, 26, 27

*North American Electric Reliability Council*, 126 FERC ¶ 61,270 (2009).............46

*Revision of Annual Charges Assessed to Public Utilities*, Order No. 641, *FERC*

    *Statutes and Regulations*, Regulations Preambles July 1996-December 2000 ¶

    31,109 (2000), *order on reh'g*, Order No. 641-A, 94 FERC ¶ 61,290 (2001).....55

*Rules Concerning Certification of the Electric Reliability Organization; and*

    *Procedures for the Establishment, Approval, and Enforcement of Electric*

    *Reliability Standards*, Notice of Proposed Rulemaking, 112 FERC ¶ 61,239

    (2005)....................................................................................................................5

*Rules Concerning Certification of the Electric Reliability Organization; and*

    *Procedures for the Establishment, Approval, and Enforcement of Electric*

    *Reliability Standards*, Order No. 672, 71 Fed. Reg. 8,662 (Feb. 17, 2006), FERC

    Stats. & Regs. ¶ 31,204 (2006), *order on reh'g*,

    Order No. 672-A, 71 Fed. Reg. 19,814 (Apr. 18, 2006), FERC Stats. & Regs. ¶

    31,212 (2006)........................................................... 5, 7, 8, 32, 35, 45, 46, 47, 62

*Texas Regional Entity*, 130 FERC ¶ 61,025 (2010)................................................11

*Transmission Planning Reliability Standards*, Order No. 786, 145 FERC ¶ 61,051

    (2013)..................................................................................................................53

*Western Electricity Coordinating Council*, 136 FERC ¶ 61,020 (2011).......... 43, 44

*Western Electricity Coordinating Council*,

    143 FERC ¶ 61,239 (2013).............................. 1, 13, 14, 22, 26, 31, 36, 46, 48, 50

*Western Electricity Coordinating Council*, 145 FERC ¶ 61,202 (2013)..................

    ...................................... 1, 12, 15, 16, 22, 26, 27, 36, 37, 46, 57, 58, 59, 62, 63, 64

# REGULATIONS

18 C.F.R. § 39.1 ...................................................................................40

18 C.F.R. § 39.11 ............................................................... 40, 45

18 C.F.R. § 39.2 ........................................................... 7, 9, 41

18 C.F.R. § 39.3 ............................................................. 39, 45

*18 C.F.R. § 39.4 ................................. 8, 32, 34, 40, 54

18 C.F.R. § 39.8 ............................................................. 40, 45

18 C.F.R. § 40.1 ...................................................................9, 41

18 C.F.R. § 40.2 ...................................................................7

INT-005-3, Interchange Authority Distributes Arranged Interchange ............ 22, 42

INT-007-1, Interchange Confirmation........................................... 22, 42

IRO-001-1.1, Reliability Coordination — Responsibilities and Authorities ... 21, 41

IRO-002-2, Reliability Coordination — Facilities .......................................... 21, 41

IRO-004-2, Reliability Coordination — Operations Planning ...............................20

IRO-005-3.1a, Reliability Coordination — Current Day Operations ....................41

IRO-008-1, Reliability Coordinator Operational Analyses and Real-time ............20

IRO-009-1, Reliability Coordinator Actions to Operate Within IROLs ................42

*NERC Rules of Procedure*, Appendix 5B (Statement of Compliance Registry Criteria)....................................................................................9, 41

TOP-003-1, Planned Outage Coordination.........................................................21

TOP-007-0, Reporting System Operating Limit (SOL) and Interconnection Reliability Operating Limit (IROL) Violations ...................................................42

*Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Balancing Authority | An entity that ensures the continuous balancing of planned generation and usage schedules within a defined geographic area |
| *Certification Order* | *North American Electric Reliability Corp.*, 116 FERC ¶ 61,062, *order on reh'g & compliance*, 117 FERC ¶ 61,126 (2006), *aff'd sub. nom.*, *Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009) |
| *Compliance Order* | *North American Electric Reliability Corp.*, 146 FERC ¶ 61,092 (Feb. 12, 2014), JA __-__ |
| *Compliance Rehearing Order* | *North American Electric Reliability Corp.*, 147 FERC ¶ 61,064 (Apr. 23, 2014), JA __-__ |
| *Declaratory Order* | *Western Electricity Coordinating Council*, 143 FERC ¶ 61,239 (June 20, 2013), JA __-__ |
| Declaratory Order Petition | WECC Petition for Declaratory Order, Docket No. EL13-52-000 (Mar. 12, 2013), JA __-__ |
| *Declaratory Rehearing Order* | *Western Electricity Coordinating Council*, 145 FERC ¶ 61,202 (Dec. 6, 2013), JA __-__ |
| Eastern Interconnection | One of two major North American alternating current power grids stretching Eastward from Central Canada to the Atlantic coast (excluding Québec), South to Florida, and West to the foot of the Rockies |
| EEI | Petitioner Edison Electric Institute |
| EEI Compliance Filing Protest | Protest of EEI in Response to the Compliance Filings Submitted in Docket Nos. EL13-52-001, RR13-10-001, and RR13-12-001 (Jan. 9, 2014), JA __-__ |
| EEI Compliance Order Rehearing Request | Request for Rehearing of EEI in Response to the *Compliance Order*, Docket Nos. RR13-10-002 |

|  | and RR13-12-002 (Mar. 14, 2014), JA __-__ |
|---|---|
| EEI Declaratory Order Rehearing Request | Request for Rehearing of EEI in Response to the *Declaratory Order*, Docket No. EL13-52-001 (July 22, 2013), JA __-__ |
| EEI Declaratory Order Petition Protest | Protest of EEI in Response to the Declaratory Order Petition, Docket No. EL13-52-000 (Apr. 18, 2013), JA __-__ |
| EEI October 11, 2013 Protest | Protest of EEI in Docket No. RR13-12-000 (Oct. 11, 2013), JA __-__ |
| Electric Reliability Council of Texas | An independent entity responsible for overseeing the transmission of electricity in Texas |
| ERO | Electric Reliability Organization |
| FPA | Federal Power Act |
| FERC | Respondent Federal Energy Regulatory Commission |
| Interchange Authority | The entity responsible for continuously balancing planned energy transfers and usage schedules between defined geographic areas |
| NERC | North American Electric Reliability Corporation |
| NERC August 26, 2013 Filing | Filing of NERC Requesting FERC Approval of Amendments to the NERC-WECC Delegation Agreement, Docket No. RR13-10-000 (Aug. 26, 2013), JA __-__ |
| NERC Compliance Filing | Compliance Filing of NERC in Response to the *Declaratory Rehearing Order*, Docket No. RR13-10-001 (Dec. 20, 2013), JA __-__ |
| NERC Executed Copy Filing | Informational Filing of NERC in Response to the *Compliance Order*, Docket No. RR13-10-001 (Mar. 4, 2014), JA __-__ |
| NERC-WECC Delegation | The agreement for NERC's delegation of |

| | |
|---|---|
| Agreement | Regional Entity authority to WECC, JA __-__ |
| Order No. 641 | *Revision of Annual Charges Assessed to Public Utilities*, Order No. 641, FERC Statutes and Regulations, Regulations Preambles July 1996-December 2000 ¶ 31,109 (2000), *order on reh'g*, Order No. 641-A, 94 FERC ¶ 61,290 (2001) |
| Order No. 672 | *Rules Concerning Certification of the Electric Reliability Organization; and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*, Order No. 672, 71 Fed. Reg. 8,662 (Feb. 17, 2006), FERC Stats. & Regs. ¶ 31,204 (2006), *order on reh'g*, Order No. 672-A, 71 Fed. Reg. 19,814 (Apr. 18, 2006), FERC Stats. & Regs. ¶ 31,212 (2006) |
| Order No. 672 NOPR | *Rules Concerning Certification of the Electric Reliability Organization; and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*, Notice of Proposed Rulemaking, 112 FERC ¶ 61,239 (2005) |
| Order No. 786 | *Transmission Planning Reliability Standards*, Order No. 786, 145 FERC ¶ 61,051 (2013) |
| Peak | Peak Reliability, Inc. |
| RC Agreement | Reliability Coordinator and Interchange Authority Agreement Between WECC and Peak |
| RC Company | The generic name for the independent entity performing the Reliability Coordinator and Interchange Authority functions for the Western Interconnection, now known as Peak |
| Regional Entity | An entity with delegated authority from the ERO under 16 U.S.C. § 824*o*(e)(4) to propose and enforce reliability standards |
| Reliability Coordinator | The entity responsible for maintaining transmission reliability and coordinating |

|  | emergency operations within its defined geographic region and across regional boundaries |
|---|---|
| SCE Comments | Comments of the Southern California Edison Company filed in Response to the Declaratory Order Petition, Docket No. EL13-52-000 (Apr. 18, 2013) |
| Section 215 | Section 215 of the Federal Power Act; 16 U.S.C. § 824*o* (2012) |
| September 8, 2011 Southwest Outage | An electric system disturbance that occurred on September 8, 2011 in the Pacific Southwest, leading to cascading outages and leaving approximately 2.7 million customers without power |
| Texas Interconnection | One of three minor North American alternating current power grids covering most of the State of Texas |
| WECC | Western Electricity Coordinating Council |
| WECC Compliance Filing | Compliance Filing of WECC in Response to FERC's *Declaratory Rehearing Order*, Docket No. RR13-12-001 (Dec. 19, 2013), JA __-__ |
| WECC Executed Copy Filing | Informational Filing of WECC in Response to FERC's *Compliance Order*, Docket No. RR13-10-001 (Mar. 13, 2014), JA __-__ |
| WECC Interchange Tool | A software application administered by WECC to perform the Interchange Authority function |
| WECC September 20, 2013 Filing | Filing by WECC in Response to FERC's *Declaratory Order*, Docket No. RR13-12-000 (Sept. 20, 2013), JA __-__ |
| Western Interconnection | One of two major North American alternating current power grids stretching from Western Canada South to Baja California in Mexico, and reaching eastward over the Rockies to the Great |

Plains

WIRAB Comments          Comments of the Western Interconnection
                        Regional Advisory Board in Response to the
                        NERC and WECC Compliance Filings, Docket
                        Nos. RR13-10-001 and RR13-12-001 (Dec. 30,
                        2013), JA__-__

# JURISDICTIONAL STATEMENT

This consolidated appeal asks the Court to review two related sets of FERC orders.  The first set, *Western Elec. Coordinating Council*, 143 FERC ¶ 61,239 (2013) ("*Declaratory Order*"), *reh'g denied*, 145 FERC ¶ 61,202 (2013) ("*Declaratory Rehearing Order*"), addresses FERC's authority under Section 215 of the FPA, 16 U.S.C. § 824*o*, to assess costs to load-serving entities in the Western Interconnection to support a newly-established entity, Peak Reliability, Inc. ("Peak"), that is performing the Reliability Coordinator and Interchange Authority functions in that region.  The second set, *North Am. Elec. Reliability Corp.*, 146 FERC ¶ 61,092 (2014) ("*Compliance Order*"), *reh'g denied*, 147 FERC ¶ 61,064 (2014) ("*Compliance Rehearing Order*"), implements that authority.

The *Declaratory Order* concluded that FERC can use Section 215 to force load-serving entities in the Western Interconnection, including EEI member utilities, to pay assessments to support Peak, which is an operating entity performing the Reliability Coordinator and Interchange Authority functions. *Declaratory Order* P 40, JA __.  EEI timely requested rehearing of the *Declaratory Order* on July 22, 2013.  *See* 16 U.S.C. § 825*l*(a).  FERC denied rehearing on December 6, 2013.  *Declaratory Rehearing Order* P 2, JA __.  EEI then filed a timely petition for review on January 27, 2014.  *See* 16 U.S.C. § 825*l*(b).

NERC and WECC then submitted agreements implementing the *Declaratory Order*, which FERC accepted. *Compliance Order* P 1, JA __. EEI timely requested rehearing of the *Compliance Order* on March 14, 2014. *See* 16 U.S.C. § 825*l*(a). FERC denied EEI's rehearing request on April 23, 2014. *Compliance Rehearing Order* P 1, JA __. EEI then filed a timely petition for review on May 13, 2014. *See* 16 U.S.C. § 825*l*(b).

This Court therefore has jurisdiction to review the orders pursuant to section 313(b) of the FPA, 16 U.S.C. § 825*l*(b), and address FERC's assertion that under Section 215 it can mandate assessments to support an entity that coordinates utilities operations but does not perform any of the functions identified in Section 215. Unless vacated by the Court, under FERC's orders there would be no meaningful limit on the activities that FERC may force utilities to fund under Section 215.

EEI's petition for review of the *Declaratory Order* and the *Declaratory Rehearing Order* was docketed by this Court in Case No. 14-1012. EEI's petition for review of the *Compliance Order* and the *Compliance Rehearing Order* was docketed by this Court in Case No. 14-1071. On June 3, 2014, the Court consolidated these cases.

## QUESTIONS PRESENTED

1. Section 215 allows FERC to impose assessments on utilities to fund the ERO and Regional Entities.  FERC has now authorized assessments requiring utilities to support Peak, which is not the ERO or a Regional Entity.  Did FERC err by authorizing assessments for the financial support of Peak?

2. Section 215 allows FERC to impose assessments on utilities to support the ERO and Regional Entities in developing and enforcing reliability standards and producing reliability reports.  FERC has now imposed assessments to support Peak's real-time operational responsibilities for coordinating transmission system operations as a Reliability Coordinator and Interchange Authority.  Did FERC err by requiring mandatory funding for those activities?

3. The statutory functions authorized by Section 215 are performed by the ERO and the Regional Entities.  No other entities can perform statutory functions. Did FERC err by authorizing financial assessments to support Peak, which is neither the ERO nor a Regional Entity, in performing what FERC claims are statutory functions?

4. Section 215 allows FERC to impose assessments on utilities to support the functions delegated by the ERO to Regional Entities.  ERO functions do not

include acting as a Reliability Coordinator or Interchange Authority.  Did

FERC err in concluding that Peak can receive statutory funding to perform

these functions when the ERO does not itself have the authority for those

functions to delegate to WECC for sub-delegation, in turn, to Peak?

5.  Whenever the ERO delegates statutory authority to a Regional Entity, FERC

has required strong oversight controls.  FERC has now authorized the sub-

delegation of purported statutory authority from WECC to Peak, but has not

required meaningful oversight controls for that authority.  Did FERC err by

departing without justification from its prior requirement for strong controls

for delegated statutory functions?

## STATUTORY AND REGULATORY ADDENDUM

A separately bound addendum reproduces the text of the statutes and

regulations discussed herein.  Also included are the referenced reliability standards

enforceable under Section 215 such as IRO-008-1 R1, where "IRO" is the category

of the standard, "008" is the number of the standard within that category, "1" is the

version of the standard, and "R1" indicates the relevant requirement within the

standard.

## STATEMENT OF FACTS AND OF THE CASE

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    Federal Power Act Section 215

The electric industry created the North American Electric Reliability Council following the 1965 blackout in the northeastern United States.  The purpose of this entity was to develop voluntary operating guidelines for electric utilities throughout North America.  Order No. 672 NOPR P 3.  Although those voluntary standards were widely implemented, noncompliance with those standards was a common cause of major regional blackouts.  *Id.* PP 3-4.  With the impetus of the August 14, 2003 blackout in the Midwest and Northeast United States, Congress enacted new legislation for mandatory and enforceable reliability standards.  *Id.* PP 5-9.

In 2005, Congress added Section 215 to the Federal Power Act as part of the Energy Policy Act of 2005, Pub. L. 109-58, Title XII, Subtitle A, 119 Stat. 594, 941, which replaced the existing voluntary compliance scheme with "a system of mandatory, enforceable Reliability Standards."   Under Section 215, all "users, owners and operators of the bulk-power system" are required to comply with mandatory reliability standards, 16 U.S.C. § 824*o*(b)(1), and any violations can receive penalties up to $1 million, per violation, per day.  *Id.* § 825*o*-1(b).

5

To implement this system of mandatory reliability standards, Section 215 established a structure for developing reliability standards and enforcing those standards against utilities.

Under this system, no reliability standard can become effective unless FERC approves it, *id.* § 824*o*(d)(2), and no penalty for violating reliability standards can take effect unless FERC permits it. *Id.* § 824*o*(e)(2).

The ERO "establish[es] and enforce[s] reliability standards for the bulk-power system, subject to Commission review." *Id.* § 824*o*(a)(2). A single entity meeting the statutory requirements is eligible for certification as the ERO, *id.* § 824*o*(c), and once certified it may develop and propose reliability standards to FERC, *id.* § 824*o*(d)(1), and impose penalties on any utility that violates a FERC-approved reliability standard. *Id.* § 824*o*(e)(1). The ERO also "conduct[s] periodic assessments of the reliability and adequacy of the bulk-power system in North America." *Id.* § 824*o*(g). The statute does not provide any other functions for the ERO. To fund its activities, the ERO must have a method to "allocate equitably reasonable dues, fees, and other charges among end users for all activities under this section." *Id.* § 824*o*(c)(2)(B).

The ERO's authority is subdivided among the Regional Entities, which receive delegated authority from the ERO "for the purpose of proposing reliability standards to the ERO and enforcing reliability standards." *Id.* § 824*o*(e)(4). Each

6

of the eight regional entities covers a portion of the larger ERO area throughout the continental United States, and each is responsible for developing regional reliability standards for its area and penalizing violations within its footprint. Order No. 672 P 642. Because only the ERO may propose reliability standards or penalties for violations, the regional entities must submit their proposed standards or sanctions first to the ERO. 16 U.S.C. § 824*o*(d) & (e).

The entities subject to Section 215 "register" with the ERO based on the reliability functions they perform, such as the Reliability Coordinator or Transmission Operator functions, 18 C.F.R. § 39.2(c), and must comply with the reliability standards applicable to those functions. *See* 18 C.F.R. § 40.2.

Although FERC is a federal agency, the ERO and the Regional Entities are not. Pub. L. 109-58, Title XII, § 1211(b), 119 Stat. 946 (describing the ERO and regional entities as "not departments, agencies, or instrumentalities of the United States Government").

### B.    Section 215 Funding Regulations

When establishing its initial regulations under Section 215, FERC concluded that Section 215 "provides for federal authorization of funding limited to the development of Reliability Standards and their enforcement, and monitoring the reliability of the Bulk-Power System," but other activities would have to be funded in other ways. Order No. 672 P 202. Following FERC approval, the ERO can bill

7

and collect the fees necessary to provide this funding.  Order No. 672-A P 65.

After approving the ERO's funding formula, 18 C.F.R. § 39.4(a), FERC requires

that the ERO submit its business plan and budget for approval each year.  *Id.* §

39.4(b).  FERC reviews and approves the budget.  *Id.* § 39.4(c).  The ERO annual

budget filing also includes the budget of the Regional Entities.  *Id.* § 39.4(b).  To

the extent the ERO or Regional Entities perform non-statutory functions, those

functions would have to be funded separately.  Order No. 672 P 202.  Regional

Entities have successfully funded their non-statutory activities through other

methods.  *See, e.g.*, *North Am. Elec. Reliability Corp.*, 122 FERC ¶ 61,245 P 152

(2008).

Any entity assessed fees to support the ERO is required to pay those costs.

*Id.* § 39.4(e).  Failure to do so will lead to an ERO collection action.  *See, e.g.*,

*North Am. Elec. Reliability Corp. v. Barrick Goldstrike Mines Inc.*, Case No. 11-

cv-00794 (D. Nev.) (seeking recovery of unpaid invoices).

### C.     ERO Certification and Funding

In 2006 FERC certified NERC, now the North American Electric Reliability

Corporation, as the ERO.  *Certification Order* P 3.  FERC also approved NERC's

proposal to allocate ERO costs to load-serving entities using a "net energy for

load" methodology.  Under that methodology, each load-serving entity's share of

the total annual energy consumption in the ERO footprint is the portion of ERO

8

costs that the load-serving entity must pay. *Id.* P 155. The costs for each Regional

Entity's statutory functions are allocated in the same manner. *North Am. Elec.*

*Reliability Corp.*, 117 FERC ¶ 61,091 PP 10-11 (2006). This Court upheld

FERC's use of the net energy for load allocation methodology. *Alcoa Inc. v.*

*FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009). Each Regional Entity handles

billing and collection of ERO and Regional Entity costs within its region.

*Certification Order* P 169.

## II.   FUNDING FOR RELIABILITY COORDINATION IN THE WESTERN INTERCONNECTION

A Reliability Coordinator is the highest level operational authority for

operational planning and real-time operation of the electric system. Appendix 5B

to the NERC Rules of Procedure, binding under 18 C.F.R. § 39.2(b), defines the

Reliability Coordinator as:

> The entity that is the highest level of authority who is responsible for
> the Reliable Operation of the Bulk Electric System, has the Wide Area
> view of the Bulk Electric System, and has the operating tools,
> processes and procedures, including the authority to prevent or
> mitigate emergency operating situations in both next-day analysis and
> real-time operations.

> The Reliability Coordinator's responsibilities are further defined in the

applicable reliability standards. 18 C.F.R. § 40.1(b); *see also* Attachment B to the

Declaratory Order Petition, JA __-__ (containing those reliability standards

applicable to the Reliability Coordinator at the time).

Before FERC created the Section 215 regulatory structure, a single entity, WECC, was the Reliability Coordinator for the entire Western Interconnection and also sought to act as the Regional Entity for that region.  When requesting funding for 2007, its first year as Regional Entity, WECC asked that FERC approve $6.9 million in funding for its Reliability Coordinator activities.  117 FERC ¶ 61,091 PP 42-43.  Prior to that date, the Reliability Coordinator function in the Western Interconnection was funded through voluntary contributions.  *See North Am. Elec. Reliability Corp.*, 119 FERC ¶ 61,059 PP 6-8 (2007).

FERC initially rejected WECC's proposal to fund its Reliability Coordinator function through Section 215.  117 FERC ¶ 61,091 P 51.  FERC concluded that the WECC Reliability Coordinator is "involved in real-time operations of the bulk-power system," and not simply providing situational awareness tools for other entities.  *Id.*  FERC explained that Regional Entities need situational awareness, but that they can accomplish this without participating in operations as a Reliability Coordinator.  *Id.* P 53.  FERC also rejected any use of statutory funding to comply with reliability standards.  *Id.*

Following requests for rehearing, FERC reversed course and agreed to Section 215 funding for the WECC Reliability Coordinator.  119 FERC ¶ 61,059 P 2.  FERC concluded that the WECC Reliability Coordinator is "focused on wide-area situational awareness and wide-area operations oversight" and not involved in

10

day-to-day operations. *Id.* P 24. FERC therefore authorized WECC to bill load-serving entities in the Western Interconnection to provide the needed funding. *Id.* P 44.

WECC's budget in each subsequent year has included funding for its Reliability Coordinator function. *See, e.g.*, *North Am. Elec. Reliability Corp.*, Proposed Business Plans and Budgets in Docket No. RR11-7-000, at 75-76 (Aug. 24, 2011) (summarizing WECC's 2012 staffing budget for the Reliability Coordinator function). FERC later permitted WECC to include the WECC Interchange Tool (used to perform the Interchange Authority function) as a statutory activity, although it was funded by a Department of Energy grant. *North Am. Elec. Reliability Corp.*, Docket No. RR10-9-000 (July 23, 2010) (unpublished letter order). In 2014, these activities were budgeted for $23,219,138 in statutory funding. *See North Am. Elec. Reliability Corp.*, Proposed Business Plans and Budgets in Docket No. RR13-9-000, Attachment 10 at 3 (Aug. 23, 2013).

There are eleven Reliability Coordinators covering operations in the continental United States. No other Reliability Coordinator is funded through Section 215. *See* 117 FERC ¶ 61,091 P 50. This includes the Texas Interconnection where the Reliability Coordinator and Regional Entity are both interconnection-wide, just as in the Western Interconnection, *Texas Regional Entity*, 130 FERC ¶ 61,025 P 9 (2010), but the Reliability Coordinator does not

11

receive statutory funding.  *North Am. Elec. Reliability Corp.*, 121 FERC ¶ 61,057 P

56 (2007).  In other regions, Reliability Coordinators are funded through voluntary

arrangements or, where the function is performed by a public utility, through

FERC-approved tariffs.  EEI's members, along with other utilities, have continued

to seek a voluntary funding mechanism for Peak.  *Declaratory Rehearing Order* P

51 n.56, JA __.

## III.    WECC BIFURCATION AND THE PROCEEDINGS BELOW

### A.    Declaratory Order Proceeding

The September 8, 2011 Southwest Outage and subsequent investigation

highlighted the difficulties presented by having WECC responsible for enforcing

reliability standards as the Regional Entity and also complying with those

standards in its operational role as the Reliability Coordinator.  *See* SCE

Comments at 2-3, JA __-__.  To provide complete separation of WECC's Regional

Entity functions and reliability standards compliance functions, WECC petitioned

FERC for a declaratory order holding that if WECC "bifurcated" the Regional

Entity function from the Reliability Coordinator and Interchange Authority

functions, the independent entity performing the Reliability Coordinator and

Interchange Authority functions (called the "RC Company") would still be eligible

for Section 215 funding.  Declaratory Order Petition at 2-3, JA __-__.  WECC

would delegate its Reliability Coordinator and Interchange Authority functions to

the RC Company. *Id.* at 13, JA __.  The RC Company would be "completely independent of WECC" in its operations and finances. *Id.* at 12, JA __.

To ensure funding for the RC Company, WECC proposed that the RC Company would independently develop its annual budgets and file them with NERC, although for transitional purposes the RC Company 2014 budget would be included in WECC's 2014 budget.  Once approved by FERC as part of NERC's annual budget filing, WECC would bill load-serving entities in the Western Interconnection to support the RC Company and remit those collections to the RC Company. *Id.* at 15, JA __.

Rejecting EEI's arguments in the EEI Declaratory Order Petition Protest regarding the non-statutory nature of the RC Company's activities, particularly given WECC's recent history of involvement in every critical aspect of real-time operations to a degree far more than originally anticipated, JA __-__, FERC concluded that the RC Company would be eligible for statutory funding. *Declaratory Order* P 1, JA __.  Noting that "WECC must have assurances that RC Company will be funded . . . to proceed with its reorganization plans," *id.* P 39, JA __, FERC held that under the terms of WECC's bifurcation proposal, the RC Company could receive statutory funding. *Id.* PP 39-40, JA __.  FERC explained that nothing in WECC's proposal would make the RC Company ineligible for statutory funding because there would be no change from the factual basis for the

13

initial approval of statutory funding in 2007.  *Id.* P 41, JA __.   FERC explained
that it had initially found that the Reliability Coordinator is "not involved in day-
to-day operational decisions" and concluded that nothing had changed from that
earlier finding.  *Id.* P 41 n.49, JA __.  However, FERC acknowledged WECC
could pursue an alternative, non-statutory funding mechanism.  *Id.* P 42, JA __.

   EEI then requested rehearing, explaining that although WECC may prefer
mandatory funding for the RC Company, nothing in Section 215 authorizes such
funding for a real-time operational entity.  *See* EEI Declaratory Order Rehearing
Request, JA __-__.  Relevant to this appeal, EEI alleged errors in three categories.
First, EEI argued that Section 215 does not permit statutory funding for an
independent non-ERO, non-Regional Entity.  *Id.* at 5-6 (specifications 1 and 4), 7-
10, JA __-__, __-__.  Second, EEI argued that the Reliability Coordinator and
Interchange Authority functions are not statutory functions because they are
involved in day-to-day system operations.  *Id.* at 5-6 (specifications 2, 5, and 7),
11-16, and 21-30, JA __-__, __-__, and __-__.  Third, EEI argued that even
assuming these functions are statutory functions, they cannot be delegated to an
entity that is neither an ERO nor a Regional Entity and that the proposal lacks the
necessary oversight.  *Id.* at 5 (specification 3), 16-20, JA __, __-__.

   While this rehearing request was pending, WECC and NERC submitted the
governing documents necessary to implement the *Declaratory Order*, including the

14

Reliability Coordinator Agreement ("RC Agreement"), WECC September 20,

2013 Filing, JA __-__, and a revised NERC-WECC Delegation Agreement.

NERC August 26, 2013 Filing, JA __-__.  These documents identified the new

entity performing the Reliability Coordinator and Interchange Authority functions

as Peak.  EEI protested those filings, noting its pending request for rehearing, and

reiterating those concerns.  EEI October 11, 2013 Protest at 4-6, JA __.

On December 6, 2013, FERC denied EEI's request for rehearing.

*Declaratory Rehearing Order* P 2, JA __-__.  FERC explained that Peak would be

eligible for statutory funding even though it is not the ERO or a Regional Entity

because WECC would sub-delegate these responsibilities to Peak.  *Id.* P 40, JA __.

FERC concluded that Peak would be performing statutory activities because there

was no factual change from its earlier finding in 2007, *id.*, and that Peak would not

be exercising any "day-to-day operational control" of the transmission system.  *Id.*

PP 43-44, JA __.  FERC also concluded that WECC's ability to terminate the RC

Agreement, subject to FERC agreement, provided sufficient oversight of the

purported statutory functions.  *Id.* P 42, JA __.

However, the *Declaratory Rehearing Order* also found that the documents

WECC and NERC had proposed to implement the bifurcation did not comply with

the *Declaratory Order* because they provided for the transfer of the Reliability

Coordinator and Interchange Authority functions and not a series of delegations of

15

those functions from NERC, to WECC, to Peak. *Id.* P 48, JA __-__. FERC gave

WECC and NERC thirty days to submit revised documents if they chose to

implement a sub-delegation structure. *Id.* PP 48, 50, JA __, __. FERC

acknowledged that WECC could also choose not to sub-delegate. *Id.* P 48 n.50, JA

__. The *Declaratory Rehearing Order* prohibited billing to support Peak until

WECC and NERC submitted the revised documents to accomplish sub-delegation.

*Id.* P 52, JA __.

On January 27, 2014, EEI then timely filed with this Court a petition for

review of the *Declaratory Order* and *Declaratory Rehearing Order*.

## B.     Compliance Filing Proceeding

On December 19, 2013, WECC submitted a revised RC Agreement,

specifically adopting the sub-delegation structure. WECC Compliance Filing at 3,

JA __. On December 20, 2013, NERC submitted a revised NERC-WECC

Delegation Agreement, restoring the delegation of the Reliability Coordinator and

Interchange Authority functions from NERC to WECC. NERC Compliance Filing

at 2-3, JA __-__.

EEI protested both filings on January 9, 2014, explaining that statutory

funding for non-statutory activities is inappropriate and noting that the Reliability

Coordinator is far more involved in day-to-day system operations than had been

anticipated in 2007. EEI Compliance Filing Protest, JA __-__. On February 12,

16

2014, FERC accepted the revised documents, explaining that they established the sub-delegation structure necessary to justify statutory funding for Peak. *Compliance Order* P 15, JA __-__.  FERC also authorized billing to support Peak. *Id*. at Ordering Paragraph C, JA __.  FERC directed NERC and WECC to submit executed copies of these documents.  NERC submitted the executed NERC-WECC Delegation Agreement on March 4, 2014.  NERC Executed Copy Filing, JA __-__. WECC submitted the executed RC Agreement on March 13, 2014.  WECC Executed Copy Filing, JA __-__.

On March 14, 2014, EEI timely requested rehearing of the *Compliance Order*.  Relevant to this appeal, EEI alleged errors in three areas of FERC's decision.  First, EEI explained that FERC erroneously concluded that a non-ERO, non-Regional Entity can receive Section 215 funding.  EEI Compliance Order Rehearing Request at 6-7 (specifications 1 and 4), 8-11, JA __-__, __-__.  Second, EEI alleged that the Reliability Coordinator and Interchange Authority functions cannot be funded under Section 215, particularly because they involve day-to-day operation of the electric system as evident from WECC's recent history.  *Id.* at 6-7 (specifications 2 and 6), 11-16, 20-31, JA __-__,  __-__, __-__.  Third, EEI argued that even assuming these are statutory functions, such functions cannot be performed by a non-ERO, non-Regional Entity, *id.* at 6 (specification 3), 17, JA

__, __, and even if they could, the proposed RC Agreement lacked the necessary oversight provisions.  *Id.* at 7 (specification 5), 18-20, JA __, __-__.

On April 23, 2014, FERC denied rehearing, explaining that it had denied rehearing on most of these issues in the *Declaratory Rehearing Order*. *Compliance Rehearing Order* P 11, JA __.  On the issue of the lack of meaningful oversight for statutory functions, FERC explained that WECC has sufficient control because, subject to FERC and NERC approval, it can terminate the RC Agreement, *id.* PP 13-14, JA __, and FERC and NERC can use additional oversight controls if they wish.  *Id.* P 15, JA __-__.

EEI timely filed a petition for review of the *Compliance Order* and *Compliance Rehearing Order* on May 9, 2014.

In response to EEI's unopposed motion to consolidate the appeals of FERC's *Declaratory Order* proceeding, Case No. 14-1012, and the orders approving the RC Agreement and NERC-WECC Delegation Agreement, Case No. 14-1071, this Court consolidated both petitions for review on June 11, 2014.  This provides the Court the opportunity to review simultaneously the orders on the "underlying legal issues regarding Peak Reliability's eligibility for FPA section 215 funding," *Compliance Rehearing Order* P 12, JA __, as well as the orders approving the implementation of those legal determinations.  *See Compliance Order* at Ordering Paragraphs A and C, JA __.

18

## SUMMARY OF ARGUMENT

As FERC's orders would not only force utilities to fund an entity and activities outside the scope of the statute but also open the door to funding all manner of operating entities, the Court should vacate those orders.

The transmission system providing instantaneous electric energy to end-users throughout the United States is managed by system operators working for electric utilities of all kinds.  Some are traditional, investor-owned utilities.  Others are state agencies and local municipalities.  Still others are rural electric cooperatives and federal power administrations.  Each is responsible for the real-time operation of its unique transmission system.

However, electric energy does not flow only to the borders of a utility.  It flows across every interconnected utility's transmission system.  In the Western United States, heavily-populated cities along the Pacific Coast often rely on huge electric generators located in interior states or the massive hydroelectric projects in the Pacific Northwest for much of their energy needs.  The transmission lines used to transfer this power are often hundreds of miles long, passing through multiple utilities and interacting with smaller transmission systems along the way. Transmission system operators must keep electricity generation and use in constant balance within highly precise tolerances measured in fractions of a second.  That

balancing allows operators to ensure that lines are properly loaded and operating within defined technical limits.

Because of the complicated interplay of the various generators, lines, and load centers, this interaction between multiple transmission systems cannot be managed as if each individual utility is an island. Instead, highly organized and coordinated real-time operation is necessary.

In the United States, that coordination is provided by the real-time oversight and operational control of Reliability Coordinators. For the entire Western Interconnection, an area encompassing all or portions of fourteen Western states and portions of Canada and Baja Mexico, a single entity—Peak—serves as the Reliability Coordinator. Ten Reliability Coordinators oversee the Eastern Interconnection, and one oversees the Texas Interconnection.

In performing its Reliability Coordinator function, Peak monitors the real-time operations of each utility, coordinates and approves various next-day planning activities, and directs specific actions during emergencies.

In preparing for each day, Peak analyzes expected system operations, including generation and load levels, to determine whether the system can withstand possible contingencies. *See* IRO-008-1 R1. If that assessment identifies concerns, Peak will direct the utilities to make the necessary adjustments in their operating plans, and those utilities must comply. *See* IRO-004-2 R1. For example,

20

if two utilities are planning generator maintenance outages and Peak's assessment indicates voltage support concerns, Peak could direct one of those utilities to delay its outage.  *See* TOP-003-1 R4.

In current-day operations, Peak's authority is at its zenith.  Using its real-time monitoring capabilities for the entire Western Interconnection, *see* IRO-002-2 R5, combined with its constant contingency analysis, *see* IRO-002-2 R6, Peak can identify system reliability concerns as they arise.  To mitigate those concerns, Peak can direct utilities to take any actions Peak deems necessary to preserve system reliability.  *See* IRO-001-1.1 R3.  Those actions could include, for example, ramping generation, opening transmission lines, or even shedding end-user load to prevent larger outages.  Any utility receiving a Peak directive must comply.  *See* IRO-001-1.1 R8.

When performing its role as an Interchange Authority, Peak also exercises real-time operational authority.  As the name suggests, the Interchange Authority manages the interchange of energy between various Balancing Authorities, entities that ensure continuous balancing of planned generation and usage schedules within a defined geographic area.  The correct scheduling of interchange ensures that schedules between Balancing Authority areas do not cause excessive or deficient generation.  To ensure interchange is accurately scheduled, Peak distributes interchange information to Balancing Authorities in the Western Interconnection.

21

*See* INT-005-3 R1.  Peak also ensures that any two Balancing Authorities exchanging energy have balanced their scheduled transactions so that the sending utility is sending the amount of energy that the receiving utility is expecting.  *See* INT-007-1 R1.

Despite these authorities and responsibilities, FERC has concluded that Peak is not "involved in day-to-day operational decisions" for the transmission system.  *Declaratory Order* P 41 n.49, JA __.  Instead, FERC concluded that Peak is performing the functions of a Regional Entity under Section 215.  *See Declaratory Rehearing Order* PP 39-40, JA __-__.  Because Section 215 allows the ERO to collect monies for all its activities under the statute, and because FERC concluded that Peak's functions are statutory, FERC authorized mandatory fee assessments to every load-serving entity in the U.S. portion of the Western Interconnection to fund Peak's operations.

FERC's conclusion overlooks two essential characteristics of Peak and, in doing so, contravenes the limitations on the entities and functions that may be funded under Section 215.

First, Peak is not a Regional Entity that proposes and enforces reliability standards and remains independent of real-time operations.  WECC is the Regional Entity for Peak's region.  Section 215 only provides statutory funding for Regional Entities and the ERO itself.  By funding Peak using Section 215's mandatory

22

funding mechanism, FERC is acting outside its authority under the Federal Power Act.

Second, Peak does not perform any of the Regional Entity functions contained in the statute. Regional Entities are authorized to propose and enforce reliability standards, fining entities for noncompliance. They do not have any operational role. Peak does not propose or enforce reliability standards; instead Peak complies with the applicable reliability standards when performing the real-time operational functions of a Reliability Coordinator and Interchange Authority. FERC's decision to authorize mandatory funding for an entity that does not perform statutory functions violates the limits on Section 215 funding. Non-statutory activities should be financed with non-statutory funding.

FERC's conclusion that the Reliability Coordinator and Interchange Authority functions are statutory functions and therefore eligible for statutory funding also runs into another statutory barrier: if these are Section 215 functions, Peak cannot perform them. The only entities that can perform statutory functions—and therefore receive statutory funding—are the ERO and the Regional Entities. As Peak is not the ERO or a Regional Entity, it cannot perform statutory functions.

Even if FERC's decision survives these statutory challenges, its decision-making is arbitrary and capricious. FERC concludes that statutory funding is

23

appropriate because the authority to perform the functions that FERC is funding

has been delegated to Peak.  This holding fails to demonstrate reasoned decision-

making on the delegation of authority.  To the extent an entity *receives* delegated

authority in any matter, that authority must be delegated *from* another entity with

that authority.  No such structure exists here.  FERC's delegation theory is that

NERC, as the ERO, has delegated the Reliability Coordinator and Interchange

Authority functions to WECC, which has in turn delegated that authority to Peak.

This ignores, however, FERC's own holding that NERC, as the ERO, does not

have the authority to perform the Reliability Coordinator or Interchange Authority

functions.  If NERC lacks that authority, NERC cannot delegate that authority to

WECC for sub-delegation to Peak.

Even if the Reliability Coordinator and Interchange Authority functions are

delegable to Peak and qualify as statutory functions, FERC has discarded the

controls imposed on such authorities.  Section 215 functions involve the exercise

of government authority.  For that reason, FERC has always mandated strict

controls over that authority when it is delegated to a Regional Entity.  But FERC

has exempted Peak from any such controls.  Instead, the only control is termination

of the entire delegation, which requires the consent of FERC.  FERC's orders

provide no rational explanation why purported statutory functions performed by

Peak should be exempt from the oversight mechanisms FERC has uniformly imposed in every other circumstance.

Granting this petition will place Peak in the same position as every other Reliability Coordinator and Interchange Authority in the United States—supported in its continued operation by the utilities in its region through voluntary funding or other mechanisms. Indeed, Peak and the utilities in its region have continued to engage in negotiations to develop just such funding alternatives.

## STANDING

EEI meets the requirements for an association to have standing in federal court because: (i) EEI's members would otherwise have standing to sue in their own right because they are being invoiced to support Peak; (ii) the interests that EEI seeks to protect are germane to the association's purpose as the trade association of investor-owned utilities; and (iii) neither the claim asserted nor the relief requested requires the participation of the individual members of EEI in the lawsuit. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Any party aggrieved by a FERC order may seek judicial review. 16 U.S.C. § 825*l*(b). A party is aggrieved if it can establish the "constitutional and prudential requirements for standing" to challenge the underlying orders. *See New York Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011). The

25

constitutional requirements for standing are (a) injury-in-fact, (b) causation, and (c) redressibility. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

EEI satisfies these requirements and therefore has standing to petition for review because FERC's orders utilize Section 215 to require utilities in the Western Interconnection, including EEI members, to pay charges assessed by the ERO and billed and collected by WECC to support the activities of Peak as a Reliability Coordinator and Interchange Authority. Billing and collection of these costs is currently ongoing. If this Court vacates those orders, EEI's members could not be billed for these costs.

The *Declaratory Order* concluded that Peak was eligible for statutory funding. *Declaratory Order* P 40, JA __. FERC claimed this was necessary to provide "assurances" that Peak would be funded. *Id.* P 39, JA __-__. FERC then denied EEI's request for rehearing on this issue, *Declaratory Rehearing Order* P 40, JA __, making its decision a final order. *See Compliance Rehearing Order* P 11, JA __-__. WECC and Peak then moved forward with their bifurcation in reliance on that determination that they would be able to charge utilities, including EEI's members, for Peak's activities, thereby aggrieving EEI's members. *See Southwest Power Pool, Inc. v. FERC*, Case No. 12-1158, slip op. at 5-6 (D.C. Cir. Dec. 3, 2013) (finding a FERC declaratory order sufficiently aggrieving when parties would act in reliance on that order).

26

NERC and WECC then submitted the governance documents implementing the decision in the *Declaratory Order*, and FERC authorized Peak to charge utilities in the Western Interconnection, including EEI's members, for the costs to support Peak. *Compliance Order* Ordering Paragraph C, JA __. FERC then denied EEI's request for rehearing, making its decision a final order. *See Compliance Rehearing Order* P 10, JA __. Peak has been invoicing EEI's members for its costs since that time, thereby aggrieving EEI's members.

Because the *Declaratory Rehearing Order* conditioned statutory funding on WECC and NERC compliance filings explicitly adopting a sub-delegation approach, *see Declaratory Rehearing Order* PP 2, 48 & n.50, JA __, __, EEI protested the subsequent compliance filing, requested rehearing of the subsequent order approving that filing, and perfected its appeal of those orders. That provides standing for EEI to appeal and raise these issues before the Court because EEI's members were aggrieved by the billing authority granted in the *Compliance Order*. *See Alcoa*, 564 F.3d at 1346; *DTE Energy Co. v. FERC*, 394 F.3d 954, 960-61 (D.C. Cir. 2005).

## ARGUMENT

## I.    STANDARD OF REVIEW

The Administrative Procedure Act directs this Court to "hold unlawful and set aside" any "action, findings, and conclusions" of FERC that the Court finds

27

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of [FERC's] statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), 706(2)(C).

To determine whether FERC acted outside its statutory jurisdiction and authority, the Court follows the two-step analysis provided by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*").  The Court first looks to the statute itself to determine if Congress directly spoke to the question.  If Congress's intent is apparent from the statute, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.  If Congress has not spoken to the question at issue, the Court must then determine whether FERC's interpretation of the statute "is based on a permissible construction of the statute." *Id.* at 843.

The Court can address the key question in this case at the first step of its *Chevron* analysis because FERC's orders in the underlying proceedings are contrary to the plain meaning of Section 215. *See id.* at 842-43, 843 n.9.  That question is whether FERC may use Section 215 to impose mandatory fees on electric utilities not only to support the activities of the ERO and Regional Entities in developing and enforcing reliability standards but also to support the activities of entities whose only function is to comply with those standards.

28

FERC "has no power to act unless and until Congress confers power upon it," *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004), and its regulatory power is "limited to the scope of the authority Congress has delegated to it." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005). If Section 215 does not grant FERC the authority to fund entities other than the ERO and the Regional Entities and does not grant FERC the authority to fund activities other than reliability standards development and enforcement and performing periodic reliability reports, the mandatory assessments authorized to support Peak are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(C). Likewise, if Section 215 permits only the ERO and Regional Entities to perform statutory functions, a decision to permit another entity to perform those functions would exceed the scope of FERC's statutory authority. *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 398. Regardless of FERC's policy reasons for imposing mandatory funding to support Peak, its authority "must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). If the Federal Power Act "unambiguously restricts" FERC from exercising that claimed authority, the analysis stops at *Chevron* step one. *Elec. Power Supply Ass'n v. FERC*, Case No. 11-1486, slip op. at 14 (D.C. Cir. May 23, 2014).

Even if FERC's decision survives *Chevron* review, FERC's decision-making process must not be arbitrary and capricious.  5 U.S.C. § 706(2)(A).

FERC's decision to allow NERC to delegate to WECC an authority that NERC lacks so that WECC can delegate that authority to Peak must follow "the requirements of reasoned decisionmaking."  *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010).

FERC's conclusion that Peak's activities as the Reliability Coordinator and Interchange Authority do not involve Peak in the real-time operation of the transmission system must likewise demonstrate "a rational connection between the facts found and the choice made."  *See PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) ("*PSEG*") (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"))).

FERC's decision to exempt Peak from the oversight mechanisms otherwise required for any entity exercising statutory functions under Section 215 cannot be an unexplained departure from FERC's own precedent.  *See State Farm*, 463 U.S. at 41-42; *Mich. Pub. Power Agency v. FERC*, 405 F.3d 8, 12 (D.C. Cir. 2005).

II.    **SECTION 215 DOES NOT AUTHORIZE FERC TO IMPOSE MANDATORY ASSESSMENTS TO FUND ANY ENTITY THAT IS NOT THE ERO OR A REGIONAL ENTITY**

Under Section 215, FERC can authorize mandatory funding to support the statutory activities of the ERO and the Regional Entities. However, Section 215 does not provide for funding any other entities. Because the underlying orders authorize mandatory assessments to financially support Peak, which is not the ERO or a Regional Entity, FERC's actions are "in excess of [FERC's] statutory jurisdiction [and] authority" and should therefore be vacated. 5 U.S.C. § 706(A)(C).

A.    **Peak Is Neither the ERO Nor a Regional Entity**

Section 215 provides for a single entity to be certified as the ERO. 16 U.S.C. § 824*o*(c). NERC has been certified as that ERO. *Certification Order* P 3. Peak is therefore not the ERO.

Section 215 defines Regional Entities as having delegated authority from the ERO for "proposing" and "enforcing" reliability standards. 16 U.S.C. § 824*o*(e)(4). Peak is not a Regional Entity because it has no delegated authority from the ERO to propose or enforce reliability standards. RC Agreement § 1.1, 1.2; JA __; NERC Compliance Filing at 4, JA __ ("Peak Reliability, to which WECC proposes to sub-delegate certain responsibilities and functions, is not a Regional Entity."). FERC does not dispute this. *Declaratory Order* P 41, JA __

31

(rejecting arguments that Peak cannot receive statutory funding even though it

"would not be the ERO or a Regional Entity").

**B.     Section 215 Limits Statutory Funding to the ERO and Regional Entities**

Section 215 permits the ERO and the Regional Entities to receive funding

through mandatory assessments approved by FERC and collected from load-

serving entities in the continental United States.  This stems from 16 U.S.C. §

824*o*(c)(2)(B), which provides that the ERO must have rules that "allocate

equitably reasonable dues, fees, and other charges among end users for all

activities under this section."  FERC authorizes that funding.  Order No. 672 P

202.  The ERO is also responsible for funding the Regional Entities in carrying out

their delegated functions.  *Id.* P 227.

Once FERC accepts the budget for the ERO and the Regional Entities, 18

C.F.R. § 39.4(c), bills are issued to load-serving entities.  *Certification Order* P

168.  Every load-serving entity is then obligated to pay all such assessments "in a

timely manner."  18 C.F.R. § 39.4(e).

Peak, which FERC has funded in the underlying orders, is not the ERO or a

Regional Entity.  Its activities are therefore not eligible for funding under Section

215, and FERC's orders to the contrary are outside of FERC's statutory authority.

5 U.S.C. § 706(2)(C).  Congress has defined the entities eligible for Section 215

funding, and those entities are the ERO performing its activities under the statute

32

and Regional Entities with delegated authority from the ERO to assist in those
activities.  By authorizing funding only for the ERO and Regional Entities, under
the principle of *expressio unius exclusio alterius*, Congress intended to limit
Section 215 funding to only those entities.  *See Andrus v. Glover Constr. Co.*, 446
U.S. 608, 616-17 (1980) (citing *Cont'l Cas. Co. v. United States*, 314 U.S. 527,
533 (1942)).  The Court must "give effect to the unambiguously expressed intent
of Congress."  *Chevron*, 467 U.S. at 843.  Because Congress did not grant FERC
the authority to fund other entities, FERC lacks the power to authorize mandatory
assessments to support Peak.  *See Cal. Indep. Sys. Operator Corp.*, 372 F.3d at
398.

### C. <u>FERC's Regulations Limit Statutory Funding to the ERO and Regional Entities</u>

FERC's own regulations implementing Section 215 also limit funding to the
ERO and Regional Entities.  FERC typically receives deference in interpreting its
regulations.  *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377
(1998).  However, any interpretation cannot be "plainly erroneous or inconsistent
with [FERC's] regulation[s]."  *Stinson v. United States*, 508 U.S. 36, 45 (1993).
Because FERC's conclusion that statutory funding is available for Peak, a non-
ERO, non-Regional Entity, is inconsistent with FERC's own regulations, the Court
should reject it.

For example, FERC's budgetary approval regulations provide only for the ERO and Regional Entities.  The ERO must file its own budget proposal each year along with the proposed budgets for each Regional Entity.  18 C.F.R. § 39.4(b).  However, Peak's budget proposal will be entirely separate from the budget proposal of WECC, the applicable Regional Entity.  Declaratory Order Petition at 15, JA __.  Because ERO and Regional Entity budget proposals are the only budget proposals that may be filed with FERC, 18 C.F.R. § 39.4, receiving and approving a budget proposal from a non-ERO, non-Regional Entity is inconsistent with FERC's regulations.

Similarly, FERC's regulations require that each annual budget filing submitted by the ERO must describe, in line items, not only the ERO's own activities but also "the activities of each Regional Entity that are delegated or assigned to each Regional Entity."  *Id.* § 39.4(b).  FERC's regulations do not provide for describing the activities of other entities, such as Peak, in the required annual budget filings.

Because FERC's regulations governing Section 215 funding, 18 C.F.R. § 39.4, do not address funding for any entity other than the ERO and the Regional Entities, it is unclear how those regulations could be applied to Peak, because Peak is neither the ERO nor a Regional Entity.  FERC has simply declared, despite the plain language of the regulations, that they do apply.  That decision stretches any

34

application of FERC's regulations well past their breaking point and requires

reversal.  *See Stinson*, 508 U.S. at 45.

### D.    FERC's Precedent Limits Statutory Funding to the ERO and Regional Entities

The arbitrary and capricious nature of FERC's orders is also apparent in

FERC's willingness to overlook its own precedent in funding an entity that is not

the ERO or a Regional Entity.  In establishing the Section 215 structure, FERC

concluded that all statutory funding must flow through the ERO and that funding

provided by the ERO to Regional Entities "would be limited to a Regional Entity's

costs related to the delegated functions."  Order No. 672 P 229.  Peak's costs are

not "a Regional Entity's costs" related to "delegated functions" because Peak is not

a Regional Entity.  *See also North Am. Elec. Reliability Corp.*, 129 FERC ¶ 61,040

P 38 (2009) (approving budgets for Regional Entities to perform "delegated,

statutory functions," such as compliance monitoring and enforcement, performing

cyber security audits, and processing compliance exceptions); *North Am. Elec.

Reliability Corp.*, 137 FERC ¶ 61,071 P 19 (2011) (approving Regional Entity

budgets because they provide adequate staffing and funding "to perform the

delegated statutory functions").  As Peak's costs for providing the Reliability

Coordinator and Interchange Authority functions are not "a Regional Entity's

costs," they cannot be passed through the ERO funding mechanism under FERC's

precedent.  In the underlying order, FERC has effectively rescinded its prior

35

limitations on who can receive statutory funding and must therefore provide a "reasoned analysis" justifying the change. *Entergy Servs., Inc. v. FERC*, 319 F.3d 536, 541 (D.C. Cir. 2003).

FERC found that because WECC would be sub-delegating the Reliability Coordinator and Interchange Authority functions to Peak, funding Peak is no different from funding WECC. *Declaratory Order* P 41, JA __; *Declaratory Rehearing Order* P 40, JA __. This justification fails to provide a "well considered basis for the change." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355-56 (1989).

Sub-delegation by a Regional Entity does not make Peak a Regional Entity. Peak is not an independent contractor hired by WECC to assist WECC in performing WECC's delegated functions. Instead, the RC Agreement makes Peak completely independent of WECC: "All RC functions shall be performed by employees of Peak, and the performance of their duties shall be independent of WECC's influence or control." RC Agreement § 2.1, JA __. Furthermore, "Peak's personnel are not subject to the control of WECC and have full decision-making authority to perform all RC functions." *Id.* Indeed, Peak is only directed to comply with reliability standards, other applicable laws, and relevant FERC authorizations, but not any direction from WECC. RC Agreement § 1.5, JA __. Under the terms of this agreement, it is not plausible to claim that Peak is assisting

36

WECC in accomplishing WECC's delegated functions.  Indeed, FERC explained that WECC could use an independent contractor model for Peak as an alternative to sub-delegation, *Declaratory Rehearing Order* P 49 n.52, JA __, but WECC opted for a sub-delegation structure.  WECC Compliance Filing at 3, JA __.

The flow of funding to support Peak's operations also indicates Peak's independence.  Peak develops its own business plan and budget and submits it directly to NERC, bypassing WECC completely.  RC Agreement § 3.2, JA __-__.  WECC will bill load-serving entities directly for Peak's costs, but cannot withhold payment from Peak.  RC Agreement §§ 3.3, 3.4, JA __.

As Peak is independent of WECC in all aspects of its operations, budgeting, and expenditures, Peak's costs are not "a Regional Entity's costs" related to "statutory functions," and permitting statutory funding for Peak reflects an unexplained departure from FERC's precedent.  FERC failed to even "display awareness that it *is* changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## III.   PEAK IS NOT PERFORMING SECTION 215 FUNCTIONS AND THEREFORE CANNOT RECEIVE SECTION 215 FUNDING

Section 215 provides for the ERO and Regional Entities to perform two functions: developing reliability standards and enforcing reliability standards by, for example, imposing fines or requiring mitigation.  16 U.S.C. § 824*o*(c)-(e).  The only other function in the statute is producing reports on system reliability and

37

adequacy.  *Id.* § 824*o*(g).  The ERO can collect fees to fund these activities.  *Id*. § 824*o*(c)(2)(B).  Because Peak is not developing reliability standards, enforcing reliability standards, or producing reliability reports, Peak's activities are not eligible for statutory funding.  FERC's orders approving such funding are therefore outside FERC's statutory authority, 5 U.S.C. § 706(2)(C), and should be vacated.

FERC's decision-making in authorizing Section 215 funding is also arbitrary and capricious under 5 U.S.C. § 706(2)(A) because it departs from FERC's precedent, *see State Farm*, 463 U.S. at 41-42, ignores FERC's regulations, *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005), and disregards the record evidence indicating that Peak performs an operational role in complying with reliability standards, not a governance role in developing and enforcing reliability standards.  *See Natural Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987).

## A.    Section 215 Functions Do Not Include Reliability Coordinator and Interchange Authority Activities

The ERO may charge "dues, fees, and other charges" for the costs of "activities under this section," i.e. Section 215.  16 U.S.C. § 824*o*(c)(2)(B).  FERC claims this includes Reliability Coordinator and Interchange Authority activities, but that view finds no support in the statute, FERC's regulations, or FERC's own precedent.

38

1.    <u>Section 215 Activities Only Include Developing and Enforcing
Reliability Standards and Performing Periodic Reliability
Assessments</u>

The only activities under Section 215 are developing reliability standards, 16

U.S.C. § 824*o*(d), enforcing reliability standards, *id.* § 824*o*(e), and "conduct[ing]

periodic assessments of the reliability and adequacy of the bulk-power system."

*Id.* § 824*o*(g).  For that reason, the ERO is defined as "the organization certified by

FERC . . . the purpose of which is to establish and enforce reliability standards."

*Id.* § 824*o*(a)(2).  Regional Entities are defined in 16 U.S.C. § 824*o*(a)(7) as

"having enforcement authority pursuant to subsection (e)(4)," which in turn

explains that the ERO may "enter into an agreement to delegate authority to a

regional entity for the purpose of proposing reliability standards to the ERO and

enforcing reliability standards."  *Id.* § 824*o*(e)(4).  Thus, although all "users,

owners and operators of the bulk-power system" must comply with reliability

standards, *id.* § 824*o*(b)(1), the only activities eligible for statutory funding are the

ERO's activities of developing and enforcing reliability standards and producing

reliability reports.

FERC's regulations limit the activities eligible for funding in the same way,

explaining that the ERO may collect "dues, fees and charges among end users for

all activities under this part [i.e. 18 C.F.R. Part 39]," 18 C.F.R. § 39.3(b)(2)(ii).

The regulations then define the ERO's activities in a manner mirroring the statute.

39

The ERO is defined as "the organization certified by the Commission . . . the purpose of which is to establish and enforce Reliability Standards for the Bulk-Power System." 18 C.F.R. § 39.1. Regional Entities are defined as having delegated authority under 18 C.F.R. § 39.8, *id.*, which in turn explains that the ERO can delegate authority to a Regional Entity "for the purpose of proposing Reliability Standards to the Electric Reliability Organization and enforcing Reliability Standards." *Id.* § 39.8(a). Again, the only other function of the ERO is to "conduct assessments" of bulk-power system "reliability," *id.* § 39.11(a), and "adequacy." *Id.* § 39.11(b). The regulations describe no other statutory activities that could be performed by the ERO or Regional Entities.

Indeed, the regulations acknowledge that not all activities the ERO or the Regional Entities may perform are statutory. *Id.* § 39.4(b). For those activities, the regulations require the funding to come from a separate source, subject to FERC review to avoid conflicts of interest. *Id.* § 39.4(g).

>    2.    <u>The Reliability Coordinator and Interchange Authority Functions Are Not Statutory Functions</u>

Rather than developing and enforcing reliability standards or performing periodic assessments, Peak's only activities are those necessary to comply with reliability standards because Peak only acts as a Reliability Coordinator and Interchange Authority. RC Agreement § 1.1, JA __; *Compliance Order* PP 1-2, JA __-__.

Appendix 5B to the NERC Rules of Procedure, binding under 18 C.F.R. § 39.2(b), defines the Reliability Coordinator as "the highest level of authority . . . responsible for the Reliable Operation of the Bulk Electric System" and as having "the authority to prevent or mitigate emergency operating situations in both next-day analysis and real-time operations."  The Interchange Authority is defined as "authoriz[ing] implementation of valid and balanced Interchange Schedules between Balancing Authority Areas."  *Id.*

Peak's responsibilities are further defined in the reliability standards it must follow.  16 U.S.C. § 824*o*(b)(1); *see also* 18 C.F.R. § 40.1(b).  Those standards provide no support for classifying Peak's Reliability Coordinator function as statutory:

- IRO-001-1.1 R3 grants Peak "clear decision-making authority to act and to direct actions to be taken by [all other operating entities] within its Reliability Coordinator Area to preserve the integrity and reliability of the Bulk Electric System."

- IRO-002-2 R5 directs Peak to monitor all of the key system metrics and conditions.

- IRO-002-2 R7 directs that this monitoring be continuous.

- IRO-005-3.1a R6 directs Peak to coordinate appropriate action plans to address system reliability concerns.

41

- IRO-009-1 R2 and R3 require Peak to develop and implement operating procedures to avoid operating limit exceedances.

- TOP-007-0 R4 directs Peak to evaluate the actions taken to resolve operating limit violations and, if necessary, "direct actions required to return the system to within limits."

Likewise, Peak's responsibilities as an Interchange Authority provide no support for a conclusion that those activities are statutory:

- Under INT-005-3 R1, Peak will distribute arranged interchange information, including the information necessary to implement interchange curtailments.

- Under INT-007-1 R1, Peak will verify that arranged interchange is balanced and valid before permitting it to become confirmed interchange.

### 3. The Unique History of the WECC Reliability Coordinator Illustrates That It Does Not Perform Statutory Functions

Peak's governing documents and the history of the Reliability Coordinator in the Western Interconnection indicate that Peak has nothing to do with reliability standards development or enforcement or the development of ERO reliability and system adequacy assessments.

The RC Agreement describes Peak as responsible for "maintain[ing] and restor[ing] the reliability of the Western Interconnection's Bulk Electric System" and "direct[ing] and coordinat[ing] timely and appropriate actions . . . including . . . directing the curtailment of transmission service or energy schedules, directing

42

the re-dispatching of generation and directing the shedding of load." RC

Agreement § 1.2, JA __.

WECC explained that "[w]hen a problem is identified on the system, it is the

RC's responsibility to ensure that the responsible parties are addressing it and that

proper steps are taken to avoid the problem in the future. . . . Under emergency

conditions, the RC can direct action, such as the reduction of line loading or to

ensure compliance with standards." Declaratory Order Petition at 5-6, JA __.

As EEI demonstrated, Peak and its predecessor have performed a critical

role in real-time operations. *See, e.g.*, EEI Declaratory Order Petition Protest at 9-

12, JA __-__; EEI Compliance Filing Protest at 25-29, JA __-__; EEI Compliance

Order Rehearing Request at 21-31, JA __-__. When the Reliability Coordinator

fails to perform those functions adequately it harms transmission system reliability.

The WECC Reliability Coordinator was once fined $100,000 for failing to direct

appropriate real-time actions to address operating emergencies. EEI Compliance

Filing Protest at 26, JA __. In another proceeding, the WECC Reliability

Coordinator was fined $350,000 for its failures to appropriately respond to

operating emergencies, including failures to instruct other entities to take

emergency actions. *Id.* at 27, JA __ (citing *Western Elec. Coordinating Council*,

136 FERC ¶ 61,020 (2011)).

43

FERC has also issued a public report on the September 8, 2011 Southwest Outage describing numerous failures by the WECC Reliability Coordinator to fulfill its obligations for operational planning, information exchange, and real-time operations.  These failures included a failure to accurately reflect interchange values in next-day planning, a failure to provide the Reliability Coordinator with enough personnel to respond to emergencies, and a failure to recognize certain critical operating limits.  *Id.* at 27-28, JA __-__; *see also* WIRAB Comments at 4 ("[I]n the September 8, 2011 outage, the WECC R[eliability] C[oordinator] staff played a role and the R[eliability] C[oordinator] function itself was implicated.").

Finally, Peak has described itself as central to maintaining reliability in real-time, using its authority to direct actions to preserve reliability and to lead any system restoration efforts.  Peak has also hired its own system operators to perform various real-time operational functions including identifying overloaded transmission facilities, analyzing potential system contingencies, and directing transmission operations such as shedding customer load.  EEI Compliance Order Rehearing Request at 29-30, JA __-__ (citing information from Peak's website).

4.    <u>FERC's Conclusion that Peak's Functions Are Statutory Is Inconsistent with the Statute and FERC's Regulations and Arbitrary and Capricious</u>

Peak's Reliability Coordinator and Interchange Authority functions do not fit within the statutory functions of the ERO and the Regional Entities under

44

Section 215 or as defined in FERC's own regulations.  Peak does not develop

reliability standards or enforce reliability standards.  16 U.S.C. § 824*o*(c)(2)(B); 18

C.F.R. § 39.8(a).  And Peak does not assist in the periodic assessments of system

reliability and adequacy.  16 U.S.C. § 824*o*(g); 18 C.F.R. § 39.11.  Instead, Peak is

closely involved in overseeing and coordinating day-to-day real-time transmission

system operations, including issuing specific operational directives when necessary

to preserve system reliability.  Peak therefore has no functions recognized under

the statute or FERC's regulations as ERO activities for which fees or dues can be

assessed under 16 U.S.C. § 824*o*(c)(2)(B); 18 C.F.R. § 39.3(b)(2)(ii).

FERC's orders granting Section 215 funding to Peak should therefore be

reversed as outside the scope of FERC's authority under the statute, 5 U.S.C. §

706(2)(C).  The statute specifies that the ERO's activities may be funded and

specifies what those activities are, and the Court "must give effect to the

unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 843.  The

statute has "foreclose[d] the agency's assertion of authority," *City of Arlington,*

*Tex. v. FCC*, 133 S. Ct. 1863, 1871 (2013), because it provides funding only for

the ERO activities of standards development, standards enforcement, and

reliability assessments.  Consistent with FERC's precedent, because these are non-

statutory functions, they should be funded in a non-statutory manner.  Order No.

672 P 202.  Other Regional Entities have successfully funded their non-statutory

45

activities through other mechanisms, including the Southwest Power Pool Regional Entity, *see North Am. Elec. Reliability Council*, 126 FERC ¶ 61,270 P 17 (2009), and the Florida Reliability Coordinating Council, 119 FERC ¶ 61,060 P 552.

Furthermore, FERC's regulations limit funding to those statutory functions. FERC cannot simply disregard its own regulations. *See Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 981.

Finally, FERC's conclusion that Peak is performing a statutory function because it is not "involved in real-time operations of the Bulk-Power System," *Declaratory Rehearing Order* P 43, JA __; *see also Declaratory Order* P 41 n.49, JA __, is divorced from the evidence in the record. FERC claims that nothing has changed since 2007, but fails to engage the significant evidence in the record outlining Peak's key operational role, including fines for failures to properly perform that role in real-time operations. *See PSEG*, 665 F.3d at 208.

### B.   There Is No Regional Entity "Situational Awareness" Function, and If There Were, Peak Does Not Perform It

When certifying NERC as the ERO and approving the delegation agreements with the eight Regional Entities, FERC addressed statutory funding for Regional Entities and explained that the statutory functions of a Regional Entity are "proposing and enforcing Reliability Standards." *Certification Order* P 579; *see also* Order No. 672 P 654 (explaining that section 215 only "authorizes the ERO to delegate authority to a Regional Entity for the purpose of proposing

46

Reliability Standards to the ERO and enforcing Reliability Standards"). Although

Regional Entities could perform "other reliability-related functions" those

functions would not be statutory. *Id.* P 579. Those functions would also not

receive statutory funding. *Id.* P 580 ("[A]ctivities not *explicitly* funded under

section 215 of the FPA may not be funded through the ERO.") (emphasis added).

Regional Entities performing other functions would need to fund those activities in

other ways. Order No. 672 P 202.

Compliance activities necessary to follow reliability standards were also not

eligible for statutory funding. As FERC noted when accepting the first ERO and

Regional Entity budgets, "funds collected by the ERO under section 215 *should*

*not be used to pay for entities to meet reliability standards*. . . . Funds collected

under section 215 should be used for ERO and Regional Entity statutory

responsibilities such as developing and enforcing reliability standards, *not*

*implementing reliability standards*." 117 FERC ¶ 61,091 P 53 (emphasis added).

However, to accommodate WECC's proposal for an entity that would be

both Regional Entity and Reliability Coordinator, FERC found that the Reliability

Coordinator function provides "situational awareness" for the WECC Regional

Entity and was therefore eligible for statutory funding. 119 FERC ¶ 61,059 PP 23-

24. FERC then relied on this finding to conclude that Peak will continue to

47

perform that role and would therefore be eligible for statutory funding.

*Declaratory Order* P 41 n.49, JA __-__ .

Nothing in the orders cited by FERC justify its reliance on a purported "situational awareness" statutory function because there is no connection between "situational awareness" and the activities of the ERO fundable under 16 U.S.C. § 824*o*(c)(2)(B).  NERC simply proposed situational awareness as a purported statutory function when proposing its initial budget, and FERC accepted it without discussion.  117 FERC ¶ 61,091 PP 20, 28.  FERC then approved statutory funding for the WECC Reliability Coordinator on that basis, based in large part on its finding that Reliability Coordinators "are not involved in day-to-day operations," 119 FERC ¶ 61,059 P 24, while admitting that "this is not a clear-cut issue."  *Id.* P 21.  FERC simply carved out an exception from its prior decision that "[f]unds collected under section 215 should be used for ERO and Regional Entity statutory responsibilities such as developing and enforcing reliability standards, not implementing reliability standards."  117 FERC ¶ 61,091 P 53.

FERC's conclusion that Peak is eligible for statutory funding stems from this "situational awareness" activity, *Declaratory Order* PP 40-41; JA __-__, but that is a thin reed to support a departure from the statute's plain language.

First, "situational awareness" does not fall within the areas of Regional Entity responsibility listed in the statute, making this grant of authority contrary to

48

the plain language of Section 215.  *See United States v. Morton*, 467 U.S. 822, 834 (1984).

Second, as even FERC <u>excluded</u> real-time operational involvement from the purported function of situational awareness, 119 FERC ¶ 61,059 P 24, Peak's responsibilities and history, described *supra*, are unrefuted evidence that Peak is heavily involved in day-to-day operations rather than only observing those operations.  FERC's conclusion lacks a rational connection to the evidence before the agency.  *Midwest ISO Transmission Owner, et al. v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004).

Third, if WECC as a Regional Entity has a statutory obligation for situational awareness, WECC could not fulfill that obligation by delegating the responsibility in its entirety to an entity with, as outlined in the RC Agreement § 2.1, JA __, complete operational independence.  *See Natural Res. Def. Council, Inc.*, 822 F.2d at 111 (quoting *State Farm*, 463 U.S. at 43) (holding that an agency's decision-making is arbitrary and capricious when it "produces an explanation that is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise'").  Even assuming the Reliability Coordinator and Interchange Authority functions are part of WECC's "situational awareness" responsibilities, that function is no longer being performed by or for the benefit of the WECC Regional Entity.

49

Fourth, the precedent that FERC relies upon fails to address the Interchange Authority function, one of the two functions Peak will be performing. *Declaratory Order* PP 40-41, JA __-__ (citing 119 FERC ¶ 61,059 P 24). As a result, FERC has not provided a reasoned explanation for why the Interchange Authority function is a statutory function under Section 215. *See Mass. v. EPA*, 549 U.S. 497, 534-35 (2007) (holding that an agency must "ground its reasons for action or inaction in the statute").

Because FERC's conclusion that Regional Entity functions include "situational awareness" contradicts the plain language of the statute and goes against FERC's own precedent, the Court should provide it no deference. *See Robertson*, 490 U.S. at 355-56; *Natural Res. Def. Council, Inc.*, 822 F.2d at 111 (citing *State Farm*, 463 U.S. at 43). FERC's own initial interpretation of the statute, which held that the statutory functions of a Regional Entity are only "proposing and enforcing Reliability Standards," *Certification Order* P 579, is the only interpretation that hews to the language passed by Congress. FERC cannot simply create new exceptions to the requirements of the statute. *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 411 (1979) ("Although an agency's interpretation of the statute under which it operates is entitled to some deference, 'this deference is constrained by . . . the clear meaning of a statute . . . .'").

Finally, even assuming FERC is correct that situational awareness is a statutory function, FERC's description of situational awareness excludes involvement with day-to-day operations. However, as discussed *supra* Part III.A.2-3, Peak is heavily involved in all key aspects of real-time system operations. FERC's finding to the contrary ignores the evidence in these proceedings and is therefore arbitrary and capricious. *Natural Res. Def. Council, Inc.*, 822 F.2d at 111.

### C.    FERC's Orders Represent an Impermissible Interpretation of the Statute

Even if FERC's orders survive a *Chevron* step one analysis, the Court should vacate them because they are not "based on a permissible construction of the statute" under step two. *Chevron*, 467 U.S. at 843. FERC's orders, which mandate funding for an operating entity under a statutory authority intended for reliability standard governance "are contrary to clear congressional intent." *Id.* at 843 n.9.

Section 215 establishes a structure for the development and proposal of reliability standards, intended to avoid the failures of the prior voluntary standards regime. *Alcoa*, 564 F.3d at 1344. Section 215 addresses how the ERO and Regional Entities are established, 16 U.S.C. § 824*o*(c), (e)(4), how reliability standards are developed and approved, *id.* § 824*o*(d), how those standards are enforced, *id.* § 824*o*(e), and who must comply. *Id.* § 824*o*(b).

In interpreting that statute, the context of the words, the statute's place within the larger statutory scheme, and the problem Congress was addressing must be considered to determine whether the agency's interpretation is permissible. *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006). FERC's orders disregard the context of the statute and what it is intended to accomplish because the statute establishes a system for reliability standards governance and funding for that governance structure, but FERC has authorized funding for an entity with no role in reliability standards governance.

Another indication that FERC has imposed an unreasonable interpretation is FERC's failure to enunciate a meaningful limit on its authority, despite the existence of an express statutory limit on that authority. *See EPSA*, Case No. 11-1486 slip op. at 4-5, 8 (rejecting FERC's claim of authority when it provided "no limiting principle," and ignored the limiting provision in the statute).

If Peak is eligible for statutory funding because it provides the Reliability Coordinator and Interchange Authority functions that FERC deems an aspect of a Regional Entity's "situational awareness" function, what would prevent other Reliability Coordinators and Interchange Authorities in other regions from seeking similar funding authority? Indeed, in the Electric Reliability Council of Texas, a single entity performs those functions for the entire interconnection, in the same manner as Peak, but without statutory funding for the Reliability Coordinator and

Interchange Authority functions.  121 FERC ¶ 61,057 P 56.  There are many more Reliability Coordinators and Interchange Authorities throughout the continental United States that would presumably appreciate a government-guaranteed funding stream.

There is nothing in FERC's order that would prevent other types of reliability entities from also seeking similar funding.  For example, the dozens of Transmission Planners and Planning Coordinators that perform long-term transmission system analyses and planning, *see* Order No. 786 PP 1-3, would not be precluded from seeking statutory funding under the criteria used by FERC to approve Peak's proposal.  They have far less of a role in real-time operations than a Reliability Coordinator or Interchange Authority and yet provide valuable system studies.  As in *EPSA*, "nothing would stop FERC from expanding this regulation" to cover other operating entities with an important reliability role.  Case No. 11-1486 slip op. at 10,

As in *EPSA*, there is a statutory limit on FERC's assertion of authority that FERC has simply chosen to ignore.  Section 215 provides that statutory funding is available for the ERO's "activities under this section."  16 U.S.C. § 824*o*(c)(2)(B).  Those activities are described in Section 215 as "develop[ing] and enforc[ing] reliability standards for the bulk-power system," *id.* § 824*o*(a)(2), and "conduct[ing] periodic assessments of the reliability and adequacy of the bulk-

53

power system in North America." *Id.* § 824*o*(g). Regional Entities can receive

delegated authority "for the purpose of proposing reliability standards to the ERO

and enforcing reliability standards." *Id.* § 824*o*(e)(4). The statute provides no

other "activities under this section." Likewise, the statute only addresses and

provides funding for the activities of two entities in the ERO structure: the ERO

and the Regional Entities. No other entities are authorized to receive funding.

FERC is an agency of limited, express authorities. *Se. Cmty. Coll.*, 442 U.S.

at 411. As such, it has no source of authority other than that specifically granted

by statute. Because Section 215 "unambiguously restricts FERC" from funding

activities other than the ERO activities listed in the statute and also restricts FERC

from funding entities other than the ERO and Regional Entities, FERC's decision

fails at *Chevron* step one. *EPSA*, Case No. 11-1486 slip op. at 14.

Another reason to doubt FERC's interpretation of the statute in a manner

that recognizes no express limits is that the agency authority at issue is the power

to impose financial assessments, which should be read narrowly. FERC has

approved mandatory financial charges to every load-serving entity in the U.S.

portion of the Western Interconnection that must be paid under penalty of law. 18

C.F.R. § 39.4(e). These charges are passed along to each end-user under tariffs

approved by FERC or state utility regulatory agencies. *See, e.g.*, 117 FERC ¶

61,091 P 149. A load-serving entity need not have requested anything under

54

Section 215 to be assessed this charge and, in the context of the underlying orders, need not have sought any Reliability Coordinator or Interchange Authority services from Peak.

Peak's charges are thus markedly different from the assessments imposed to support FERC's own activities, which are developed by FERC, but require a measure of Congressional approval.  *See* 42 U.S.C. § 7178(a)(1) (granting FERC the authority to "assess and collect fees and annual charges . . . in amounts equal to all of the costs incurred by the Commission in that fiscal year"); Order No. 641 n.7 ("Congress approves the Commission's budget through annual and supplemental appropriations."); *see also* Consolidated Appropriations Act, 2012, Pub. L. 112-74, 125 Stat. 786, 875 (providing the Fiscal Year 2012 appropriation for FERC). No Congressional approval is necessary to implement the charges imposed under Section 215.  *See North Am. Elec. Reliability Corp.*, 141 FERC ¶ 61,086 P 1 (2012).  Outside of appellate review, FERC is the final authority on assessments to support the ERO.

As a result, FERC's power to charge load-serving entities to support the ERO should be read narrowly.  *See Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974); *see also FPC v. New England Power Co.*, 415 U.S. 345, 351 (1974) (construing FERC's authority to impose fees on electric utilities to support its operations narrowly).  FERC's assertion of a power to assess these

charges to support an entity not identified in the statute that is performing a function not identified in the statute depends on a very broad construction of FERC's assessment power.

## IV.  IF THE RELIABILITY COORDINATOR AND INTERCHANGE AUTHORITY FUNCTIONS ARE STATUTORY PEAK CANNOT PERFORM THEM

FERC's orders fail even to grapple with the implications of FERC's own sub-delegation theory.  Assuming the Reliability Authority and Interchange Authority functions are statutory functions eligible for funding under Section 215, those functions must be performed by the entities identified in the statute: the ERO or the Regional Entities.  As Peak is neither, *see supra* Part II.A, Peak cannot perform them.

Section 215 does permit funding for certain functions, but *only* the functions of the ERO and the Regional Entities.  Thus, 16 U.S.C. § 824*o*(a)(2) and § 824*o*(g) describe the functions of the ERO and 16 U.S.C. § 824*o*(c)(2)(B) provides funding for those activities.  The ERO is in turn authorized by 16 U.S.C. § 824*o*(e)(4) to enter an agreement "to delegate authority to a regional entity for the purpose of proposing reliability standards to the ERO and enforcing reliability standards." The statute does not permit further delegation of statutory functions by a Regional Entity.  Neither do FERC's regulations.

FERC has nevertheless concluded that these functions are statutory and that Peak can perform them. *Compliance Order* P 16, JA __,

FERC lacks the authority to modify the requirements of Section 215 to allow a non-ERO, non-Regional Entity to perform a statutory function. The only entities identified in the statute as performing statutory functions are the ERO and Regional Entities, and this "is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. FERC cannot approve the delegation of statutory authority to an entity not identified in the statute because Congress has not granted it that power. *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 398.

FERC claims the sub-delegation structure enables an entity not identified in the statute to perform statutory functions. *See Declaratory Rehearing Order* P 40, JA __ ("[T]he sub-delegation relationship as WECC proposed adequately ensures that there is a connection from the ERO, to the Regional Entity and then to new Peak to maintain section 215 funding."); *Compliance Order* P 15, JA __.

But Peak is not performing these functions as a contractor or arm of WECC. Instead, Peak is independent from WECC and NERC in all of its operations and budgeting. *See supra* Part II.D. Sub-delegation is not a contractor relationship. *Declaratory Rehearing Order* P 49 n.52, JA __; *Compliance Order* P 16, JA __.

57

FERC's conclusion that sub-delegation is consistent with the statute is therefore divorced from the facts in the record. *See PSEG*, 665 F.3d at 208.

FERC also claims that sub-delegation of statutory functions is permitted because the statute does not forbid it. *Declaratory Rehearing Order* P 40, JA __ ("[N]othing in FPA section 215(e)(4) . . . prohibits a sub-delegation as WECC proposed and the Commission accepted in the Declaratory Order."). But agencies do not have the authority to order anything that is not forbidden to them. *Mich. v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (explaining that an agency "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress."). FERC only has the authority expressly *granted* by statute. *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 398. FERC may only authorize Peak to perform statutory functions if the statute grants FERC the authority to do so because FERC "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). As the statute does not authorize FERC to allow entities other than the ERO and the Regional Entities to perform statutory functions, FERC has acted "in excess of [its] . . . authority" and should be reversed. 5 U.S.C. § 706(2)(C).

## V. NERC LACKS THE AUTHORITY NECESSARY TO ENABLE SUB-DELEGATION TO PEAK

Under FERC's sub-delegation theory, NERC will delegate the Reliability Coordinator and Interchange Authority functions to WECC in the NERC-WECC

Delegation Agreement. *Declaratory Rehearing Order* P 50, JA __. WECC will then sub-delegate those functions to Peak through the RC Agreement. *Id.* P 48, JA __. Through this delegation string, ERO authority is passed through WECC to Peak, enabling Peak to receive statutory funding. *Compliance Order* P 15, JA __ (explaining that NERC's delegation agreement "delegates the reliability coordinator function to WECC so that the reliability coordinator function could then be sub-delegated by WECC to Peak Reliability").

As the ERO lacks the authority to perform the Reliability Coordinator and Interchange Authority functions under Section 215, it cannot delegate that authority to a Regional Entity such as WECC. As a Regional Entity, WECC has no source of authority under the statute other than the authority delegated to it by the ERO. Because NERC cannot grant authority to perform the Reliability Coordinator and Interchange Authority functions to WECC, WECC cannot delegate those functions to Peak.

Both Section 215 and FERC's own criteria for ERO functions exclude Reliability Coordinator and Interchange Authority activities from the scope of the ERO's activities. Section 215 defines the ERO's activities as "to establish and enforce reliability standards," 16 U.S.C. § 824*o*(a)(2), as well as to conduct periodic reliability assessments. 16 U.S.C. § 824*o*(g). As explained *supra*, Part

59

III.A, these statutory activities do not include acting as the Reliability Coordinator

or Interchange Authority.

FERC has similarly limited the scope of ERO activities eligible for Section

215 funding.  Following an extensive audit of NERC's finances, FERC directed

NERC to establish criteria for identifying its activities eligible for statutory

funding.  141 FERC ¶ 61,086 P 30.  NERC developed and proposed criteria that

excluded from eligibility for Section 215 funding "[r]eal-time operating control of

the Bulk Power System."  *North Am. Elec. Reliability Corp.*, 143 FERC ¶ 61,052 P

38 (2013).  FERC accepted this as an appropriate exclusion.  *Id.* P 39.  Because

Reliability Coordination and Interchange Authority functions include operational

control of the system, these statutory criteria prevent NERC from performing those

functions.

WECC's sub-delegation to Peak depends on those criteria as well as the

language of Section 215 itself because FERC justifies Section 215 funding for

Peak on the ERO delegating a portion of its authority to WECC for sub-delegation,

in turn, to Peak.  *Compliance Order* P 15, JA __.  If the ERO lacks that authority, it

cannot delegate that authority to Peak.

FERC's orders approving the delegation of an authority the ERO lacks under

the statute and FERC's own statutory criteria violate an "axiomatic" principle of

administrative law that "an administrative agency's power . . . is limited to the

60

authority delegated by Congress." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988). NERC cannot delegate authority that it does not have. WECC, as the purported recipient of an authority NERC could not delegate, cannot then sub-delegate that purported authority to Peak. Furthermore, WECC receives its statutory authority only from its delegation agreement with NERC, and Section 215 limits the delegation to Regional Entities to only two purposes: "proposing reliability standards to the ERO and enforcing reliability standards." 16 U.S.C. § 824*o*(e)(4).

As NERC does not have the Reliability Coordinator and Interchange Authority functions to delegate and WECC lacks an independent source of statutory authority, WECC cannot delegate these authorities to Peak. FERC's conclusion to the contrary in the underlying orders is therefore inconsistent with the statute, 5 U.S.C. § 706(2)(C), and indicate a lack of reasoned and logical decision-making. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Exxon Co. U.S.A. v. FERC*, 182 F.3d 30, 42 (D.C. Cir. 1999).

## VI.  FERC HAS DEPARTED FROM PRECEDENT ON THE CONTROLS FOR STATUTORY DELEGATIONS WITHOUT EXPLANATION

In approving the RC Agreement, FERC departed from its own precedent on the controls required for statutory delegations without a reasoned explanation indicating why its prior policies and standards were changed. *See, e.g.*, *City of Charlottesville, Va. v. FERC*, 661 F.2d 945, 951 n.35 (D.C. Cir. 1981) ("[A]n

61

agency changing its course must supply a reasoned analysis indicating that prior

policies and standards are being deliberately changed, not casually ignored . . . .")

(quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir.

1970)).

The *Declaratory Rehearing Order* required WECC to implement a sub-

delegation structure for the delegation of the Reliability Coordinator and

Interchange Authority functions to Peak.  *Declaratory Rehearing Order* P 48, JA

__.  Peak failed to do so in a manner consistent with the other delegation

arrangements, which impose extensive oversight mechanisms.  *See*, *e.g.*, NERC-

WECC Delegation Agreement § 8, JA __-__.  Instead, the RC Agreement provides

for Peak's complete independence.  RC Agreement § 2.1, JA __.

This is inconsistent with FERC's precedent.  Order No. 672 established the

policy that "the Commission oversees the ERO and the ERO oversees any

approved Regional Entity."  Order No. 672 P 57; *see also North Am. Elec.*

*Reliability Corp.*, 119 FERC ¶ 61,060 P 201 (2007) (explaining that constant

information reporting from Regional Entities to NERC is necessary for NERC to

"exercise its oversight").  If a Regional Entity engages a contractor to assist it, the

"Regional Entity bears ultimate responsibility for any functions carried out on its

behalf."  *Certification Order* P 586.

To that end, other delegations have always provided extensive oversight mechanisms for statutory functions.  For example, Section 8 of the NERC-WECC Delegation Agreement, JA __, provides numerous oversight controls.  They include performance metrics that NERC may establish, *id.* § 8(a)(i)-(ii), JA __, an obligation to implement action plans to address performance concerns, *id.* § 8(a)(iii), JA __, and an ability for NERC to issue binding directives and guidance. *Id.* § 8(c)-(d), JA __-__.  When WECC was performing the Reliability Coordinator and Interchange Authority functions, NERC could have used these tools to monitor WECC's performance.

The RC Agreement provides none of these controls.  Indeed, the RC Agreement makes Peak completely independent in all of its operations, RC Agreement § 2.1, JA __, and even WECC has admitted that it "will have no authority to remove RC Company board members or to review or supervise RC Company management."  Declaratory Order Petition at 12, JA __.

FERC's response to this has been that "WECC, subject to NERC and Commission approval, would have the residual authority to terminate the sub-delegation agreement with Peak Reliability."  *Declaratory Rehearing Order* P 43, JA __.  Peak would also be subject to the same compliance monitoring as any other Reliability Coordinator or Interchange Authority.  *Id.*

63

What FERC's order fails to address is that Peak is not performing the same functions as any other Reliability Coordinator or Interchange Authority, Peak is performing *statutory* functions, at least in FERC's view.  *Id.* P 40, JA __.  If these truly are statutory functions, FERC must offer a reasoned explanation for its decision to no longer require extensive oversight provisions to accompany the delegation of statutory authority.  *City of Charlottesville, Va.*, 661 F.2d at 951 n.35.  FERC offers no explanation for why these functions required close oversight when performed by WECC, but do not when performed by Peak.

Claiming that "Peak Reliability would still ultimately be subject to Commission and NERC oversight," *Declaratory Rehearing Order* P 42, JA __, fails to justify exempting statutory functions performed by Peak from the oversight mechanisms applied to WECC's statutory functions.  It suggests, instead, that Peak is performing the same role as any Reliability Coordinator or Interchange Authority, and that there is nothing uniquely statutory about Peak's activities at all.

## CONCLUSION

FERC's orders should be vacated and remanded with instructions to FERC to cease its authorization for the billing and collection of Peak costs under Section 215.

Respectfully Submitted,

*/s/ Stephen M. Spina*

64

Stephen M. Spina
John Daniel Skees
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000
sspina@morganlewis.com

Edward H. Comer
Vice President, General Counsel
  and Corporate Secretary
Barbara A. Hindin
Associate General Counsel for
  Industry Structure
Henri D. Bartholomot
Associate General Counsel,
  Regulatory and Litigation
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 508-5000
ecomer@eei.org

Dated: July 22, 2014                    *Counsel for Edison Electric Institute*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(a)(2) because this brief contains 13,970 words, as determined by the word-counting feature of Microsoft Word 2007, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

Respectfully Submitted,

/s/ *Stephen M. Spina*

Stephen M. Spina
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000
sspina@morganlewis.com

*Counsel for Petitioner Edison Electric Institute*

Dated: July 22, 2014

# CERTIFICATE OF SERVICE

Pursuant to Rule 31 of the Federal Rules of Appellate Procedure, I hereby certify that on July 22, 2014, I electronically filed the foregoing brief along with the separately bound statutory addendum with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I certify that I have served the foregoing brief and the separately bound statutory addendum via email through the Court's CM/ECF system and U.S. Mail, where required, on the parties indicated below:

Michael Gordon Andrea
AVISTA CORPORATION
1411 East Mission Avenue
MSC-23
Spokane, WA 99220-3727
michael.andrea@avistacorp.com

Gary D. Bachman
VAN NESS FELDMAN LLP
1050 Thomas Jefferson Street, NW
Suite 700
Washington, DC 20007-3877
gdb@vnf.com

Thomas Gregory Hutton
VAN NESS FELDMAN LLP
1050 Thomas Jefferson Street, NW
Suite 700
Washington, DC 20007-3877
tgh@vnf.com

Robert Michael Kennedy Jr.
FEDERAL ENERGY REGULATORY COMMISSION
(FERC) Office of the Solicitor

888 First Street, NE
Washington, DC 20426
robert.kennedy@ferc.gov

Robert Harris Solomon
FEDERAL ENERGY REGULATORY COMMISSION
(FERC) Office of the Solicitor
Room 9A-01
888 First Street, NE
Washington, DC 20426
robert.solomon@ferc.gov

Richard Lehfeldt
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
rlehfeldt@crowell.com

Sean Neal
DUNCAN, WEINBERG, GENZER & PEMBROKE, PC
915 L Street
Suite 1410
Sacramento, CA 95814
smn@dwgp.com

Delia Denise Patterson
AMERICAN PUBLIC POWER ASSOCIATION
1875 Connecticut Avenue, NW
Suite 1200
Washington, DC 20009-5715
dpatterson@publicpower.org

Willie Lee Phillips Jr.
NORTH AMERICAN ELECTRIC RELIABILITY CORPORATION
1325 G Street, NW
Suite 600
Washington, DC 20005
willie.phillips@nerc.net

/s/ *Stephen M. Spina*

Stephen M. Spina
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000
sspina@morganlewis.com

*Counsel for Petitioner Edison Electric
Institute*